E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
KRISTIN N. SPENCER (Cal Bar. No. 294692)
MELISSA S. RABBANI (Cal. Bar No. 283993)
Assistant United States Attorneys
Santa Ana Branch Office
     8000 United States Courthouse
     411 West Fourth Street
     Santa Ana, California 92701
     Telephone: (714) 338-3500
     Facsimile: (714) 338-3708
     E-mail:   kristin.spencer@usdoj.gov
               melissa.rabbani@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. SA CR 23-38-JVS |
| Plaintiff, | GOVERNMENT'S OPPOSITION TO MOTION TO EXCLUDE DEPOSITION TESTIMONY; DECLARATION OF MELISSA S. RABBANI AND EXHIBITS |
| v. | |
| JAMAL NATHAN DAWOOD, aka "Jimmy Dawood," | Hearing Date: February 5, 2024 Hearing Time: 9:00 a.m. |
| Defendant. | |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Kristin Spencer and Melissa Rabbani, hereby submits its opposition to defendant's motion to exclude the deposition testimony of "T.B.," or Thomas Battaglia, the victim in this wire fraud and money laundering case.

The government's opposition is based upon the attached memorandum of points and authorities, the attached declaration of Melissa Rabbani and exhibits thereto (including the transcript of Mr. Battaglia's deposition), the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: January 16, 2024      Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division

 /s/ *Melissa S. Rabbani*
KRISTIN N. SPENCER
MELISSA S. RABBANI
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.  INTRODUCTION**

Defendant Jamal Nathan Dawood ("defendant") is charged with six counts of wire fraud, nine counts of money laundering, and one count of aggravated identity theft, all based on defendant's long-running scheme to defraud Thomas Battaglia of his inheritance.

In July 2023, Mr. Battaglia was hospitalized after suffering a stroke and heart attack.  In August 2023, based on serious concerns regarding Mr. Battaglia's prognosis, the government applied ex parte for an order allowing it to conduct a deposition of Mr. Battaglia pursuant to Federal Rule of Criminal Procedure 15.  The Court granted the government's application on August 31, 2023, and ordered that in light of Mr. Battaglia's health condition, the deposition should last no longer than three hours in total, excluding breaks.  Dkts. 20-24.

The parties initially scheduled the deposition for September 29, 2023, before being forced to reschedule it after Mr. Battaglia was admitted to the ICU.  See Rabbani Decl. ¶¶ 2-3.  The deposition ultimately took place on October 17, 2023, in Mr. Battaglia's hospital room in Orange, California.  Id. ¶ 4.  The government and the defense each had the opportunity to question Mr. Battaglia for 90 minutes.  The government's examination of Mr. Battaglia focused on Mr. Battaglia's relationship with defendant, including what he did and did not authorize defendant to do with respect to his inheritance, as well as the sixteen transactions that are the basis of the sixteen counts in the indictment.

Defense counsel began the deposition by announcing that there was "no way" he could successfully cross-examine Mr. Battaglia within 90 minutes and that, based on "the voluminous amount of material in

this case," defendant's cross-examination would "take much longer than an hour and a half." Defense counsel then spent his 90 minutes repeatedly challenging Mr. Battaglia's memory and truthfulness, while questioning Mr. Battaglia at length regarding his professional background; whether Mr. Battaglia was, in fact, the beneficiary of his brother's trust; and the disposition of two properties that were not the basis of any charges in the indictment.

Sadly, Mr. Battaglia died on November 3, 2023.

The government intends to introduce Mr. Battaglia's recorded deposition testimony at trial. Defendant now moves to exclude that testimony altogether, arguing that he was "unable to engage in constitutionally sufficient cross-examination." Mot. at 11. But the Sixth Amendment does not guarantee unlimited cross-examination, and this Court has wide discretion to impose "reasonable limits" on cross-examination based on concerns about a witness's health and safety. Defendant was given a meaningful opportunity to cross examine Mr. Battaglia at length about his motivations and potential bias, as well as about the transactions charged in the indictment and Mr. Battaglia's statements on direct examination. The Constitution requires no more. Defendant's motion should be denied.

**II. RELEVANT FACTS**

Defendant introduced himself to Mr. Battaglia in July 2019, shortly after Mr. Battaglia's brother, Jack Battaglia, passed away and left his considerable assets – including Jack's home in San Clemente and two rental properties he owned in Hawaii, as well as roughly two million dollars in cash – in a trust for Mr. Battaglia's

2

1 benefit.  Tr. 16:16-24; 13:1-14:19; 22:11-23:25.[1]

2 　　At the time defendant introduced himself to Mr. Battaglia, Mr.
3 Battaglia himself was 77 years old and dealing with his own health
4 concerns.  Tr. 16:16-17:7; 38:21-24.  Defendant offered to take
5 charge of renovating and selling Jack Battaglia's home and to manage
6 the Hawaii properties and the cash for Mr. Battaglia's benefit.  Tr.
7 17:10-22:1.  In particular, defendant told Mr. Battaglia that he
8 would manage the renovations and sale of Jack's home and would take
9 care of mortgage payments, homeowner's association fees, taxes, and
10 any other costs associated with the property.  Tr. 18:3-21.
11 Defendant also told Mr. Battaglia that he would "temporarily"
12 transfer ownership of the two Hawaii properties to some other entity,
13 to "put [Mr. Battaglia] in the best position regarding the
14 disposition of those properties going forward."  Tr. 21:2-22:1.  Mr.
15 Battaglia understood that the Hawaii properties would be returned to
16 him after approximately 30 days.  Id.  And with respect to the cash
17 in the retirement account, defendant advised Mr. Battaglia that the
18 money should be placed into a "special holding account to be held in
19 trust for [Mr. Battaglia]"; Mr. Battaglia understood that "at some
20 future date all of this would [] come back" to him.  Tr. 25:24-26.
21 　　Defendant represented himself as an expert in estate management
22 with extensive assets of his own.  At some point in their
23 relationship, defendant told Mr. Battaglia that he had "helped a
24 hundred people with their estates."  Tr. 33:11-23.  Defendant
25 purported to show Mr. Battaglia an account summary on his phone

---

[1] Citations to "Tr." refer to the transcript of Mr. Battaglia's deposition, attached as Exhibit A to the declaration of Melissa Rabbani.

3

screen stating that defendant had $548 million in personal assets. Tr. 33:24-34:4. Defendant also showed Mr. Battaglia a picture of seven luxury cars from his "stable of vehicles"; Mr. Battaglia remembered defendant always driving up in a "Rolls Royce or a Bentley, Mercedes, or a Land Rover." Tr. 33:24-34:4. Defendant also told Mr. Battaglia that he was a "medical doctor," an attorney, and a "financial business consultant." Tr. 45:20-46:3.[2]

Shortly after meeting Mr. Battaglia, defendant went with Mr. Battaglia to a Bank of America branch in San Clemente to open a bank account for the trust. Tr. 26:8-27:20. Mr. Battaglia understood that the money in the account was "specifically for [him] and no one else"; defendant told Mr. Battaglia that defendant himself couldn't "touch a penny of it." Tr. 27:15-20; 26:16-22. Defendant was given login information to access the trust account online. Tr. 27:21-28:4. Mr. Battaglia never learned to do so, and never accessed the account online himself; he explained that he was "not that computer savvy." Tr. 27:21-25, 28:16-29:1. Mr. Battaglia also never received paper statements in the mail for the account. Tr. 44:21-25.

Over the course of the next several months, defendant made at least six wire transfers from the trust account – totaling over $1.4 million – into accounts that defendant himself controlled, before spending that money on his own business ventures and luxury purchases. See Dkt. 1. Defendant also used Mr. Battaglia's online login to set up a recurring payment from the trust account to an LLC defendant himself controlled. See id. Mr. Battaglia did not discover until 2020 that the trust account had been drained; when he

---

[2] Public records searches show that no one by defendant's name has ever been licensed to practice law or medicine in California.

4

confronted defendant, defendant told him that the money had been transferred into "holding companies" to protect Mr. Battaglia and would be returned to him in "probably 30 to 60 days maximum." Tr. 43:14-44:5. But defendant never returned any of that money to Mr. Battaglia. Tr. 44:6-7. In addition, defendant had transferred ownership of Jack's home and the two Hawaii properties to his own entities, without ever transferring those properties back to Mr. Battaglia. In fact, defendant sold Jack's home in 2020 – and Mr. Battaglia never received any of the proceeds. See Tr. 39:13-40:10.

A federal grand jury indicted defendant in April 2023, charging him with six counts of wire fraud, nine counts of money laundering, and one count of aggravated identity theft, all based on the wire transfers and recurring payments defendant made from the trust account and defendant's subsequent expenditures of that money, which included purchases at a luxury tobacco store, payments made in connection with investments in real estate properties in Brea, Fontana, and La Crescenta, payments to defendant's wife, and payment of defendant's personal credit card bills. Defendant's conduct with respect to Jack Battaglia's home and the two Hawaii properties remains uncharged.

At his deposition, Mr. Battaglia testified that defendant never told him that he was taking money from the trust account to invest in other projects. Tr. 30:14-17; 130:13-16. Mr. Battaglia also testified that he never told defendant that he wanted to invest any of that money. Tr. 30:18-22. Mr. Battaglia explained that on numerous occasions – "maybe 12, 13" times – defendant told Mr. Battaglia to sign documents, while "obliterat[ing]" the contents of the documents and explaining that the signatures were needed "to

5

protect" Mr. Battaglia and save his funds. Tr. 30:23-31:21; 130:21-131:9.

Mr. Battaglia also testified that he had never agreed to any of the expenditures charged in the nine money laundering counts. In particular, Mr. Battaglia never agreed to invest in the purchase of any real estate in Brea, Fontana, or La Crescenta – or any other properties. Tr. 36:25-37:25. Mr. Battaglia was not familiar with Rodeo Smoke Shop – the tobacco store where defendant spent $100,000 from the trust account – and had never agreed that money from the trust account could be transferred to defendant's wife or used to pay defendant's personal credit card bills. Tr. 36:13-24; 38:3-15.

On cross examination, defense counsel began by asking Mr. Battaglia extensive questions about his health, his education and professional background, his relationship with Jack Battaglia, and his initial meetings with defendant. See Tr. 50-70. Defense counsel continued to ask questions about the nature of Mr. Battaglia's relationship with defendant and his understanding as to the scope of their agreement, including as to the repairs that were done to Jack Battaglia's home and who would fund those repairs. Tr. 70-76. Defense counsel then spent a great deal of time asking about the Hawaii properties, challenging defendant's testimony that he had never signed any documents with respect to the Hawaii property by showing defendant written documents documenting the (below market) sale of the Hawaii properties to defendant's entities, signed by Mr. Battaglia. Tr. 76-94. Defense counsel also challenged defendant's testimony that he had not been paid for sale of the Hawaii properties by showing defendant records of a wire transfer sent to the trust for approximately $180,000. Tr. 95-100; 126-128. Toward the end of his

6

1 cross-examination, defense counsel asked a number of questions about
2 modifications to Jack Battaglia's trust, suggesting that at one point
3 Jack Battaglia had revised his trust to leave his home to a third
4 party rather than to Mr. Battaglia and accusing Mr. Battaglia of
5 misrepresenting those facts.  Tr. 100-126; see also Tr. 100:22-101:6
6 (after Mr. Battaglia stated that his brother had "agreed to virtually
7 give everything" to him, defense counsel responded, "Mr. Battaglia,
8 you know that's not true.").

9     Throughout his cross-examination, defense counsel repeatedly
10 challenged Mr. Battaglia's memory and truthfulness.  See, e.g., Tr.
11 115:13-115:24 (asking whether it was "difficult" for Mr. Battaglia to
12 remember what happened in 2019 and whether the time of his brother's
13 death was a "confusing period"); 117:12-13 ("And you also are
14 confused about the Hawaii property, aren't you?"); 121:22-122:10
15 (challenging Mr. Battaglia's statement that he had no recollection of
16 statements purportedly made at a civil deposition "only twelve days
17 ago"); 128:21-22 ("In other words, all of these events are very
18 blurry to you.  Is that your testimony?"); 129:7-8 ("You're having
19 trouble remembering what happened in 2018 and 2019, aren't you?");
20 129:15-17 ("But as far as what document you signed and business
21 relationships you had, it's all kind of blurry, isn't it?").

**III. LEGAL STANDARD**

23     The Sixth Amendment to the Constitution gives a criminal
24 defendant the right to be "confronted with the witnesses against
25 him," and the Supreme Court has explained that the "main and
26 essential purpose" of confrontation is "to secure for the opponent
27 the opportunity of cross-examination."  Davis v. Alaska, 415 U.S.
28 308, 315-16 (1974) (internal quotation omitted).  But that right is

7

not unlimited.  "Generally speaking, the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (per curiam) (emphasis in original).  In fact, trial judges "retain wide latitude" under the Sixth Amendment to "impose reasonable limits on [] cross-examination," based on concerns about, among other things, "harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986).

**IV.  ARGUMENT**

The question posed by this case is simple: did defendant have Mr. Battaglia's authorization to transfer money from the trust account into defendant's own accounts, keep it, and spend it for his own purposes, or did defendant take that money from Mr. Battaglia through fraudulent promises, misstatements, and omissions?

On direct examination, Mr. Battaglia testified that he never authorized defendant to take money from the trust account for his own purposes or to invest in any separate ventures.  Instead, Mr. Battaglia understood that the money would be held for his – Mr. Battaglia's – benefit, and not defendant's.  Mr. Battaglia also explained that defendant repeatedly – on roughly 12 or 13 occasions – had Mr. Battaglia sign various legal documents, while concealing the contents of those documents and promising Mr. Battaglia that the documents were for Mr. Battaglia's own protection.  Mr. Battaglia also confirmed that after the trust account had been drained, he never got "a penny" of the money back from defendant.

8

The Sixth Amendment guaranteed defendant an "opportunity" to cross-examine Mr. Battaglia on these statements and to explore Mr. Battaglia's potential motivations, biases, veracity, and recollection. But this Court had the discretion to impose reasonable limits on that opportunity in order to protect Mr. Battaglia's health and safety.

At the time of his deposition, Mr. Battaglia clearly was seriously ill and facing the end of his life. He had been hospitalized for over two months following a stroke and heart attack; as he himself testified, he was unable to stand or walk, and had to testify from a hospital bed. See Tr. 51:2-8. Mr. Battaglia received oxygen support throughout the deposition and appeared to be fatigued after several hours of testimony. See Rabbani Decl. Ex. B. In light of Mr. Battaglia's serious health concerns, the limited scope of the charges in this case, and the fact that the government itself was restricted to 90 minutes of direct examination, the Court's 90-minute limitation on cross-examination was more than reasonable.

Courts have repeatedly upheld similar limits on cross-examination. As the Ninth Circuit has explained, "[g]enerally speaking, a court violates the Confrontation Clause only when it prevents a defendant from examining a particular and relevant topic, such as bias." Fenenbock v. Director of Corrections for California, 692 F.3d 910, 919 (9th Cir. 2012). "[A]s long as the jury receives sufficient information to appraise the biases and motivations of the witness," "[n]o Confrontation Clause violation occurs." Id. at 919-20 (quoting Hayes v. Ayers, 632 F.3d 500, 518 (9th Cir. 2011)).

In Fenenbock, 692 F.3d at 915, for example, the Ninth Circuit held that the district court did not violate the Sixth Amendment by

9

imposing a time limitation on cross-examination of a key witness: a minor who was "showing signs of fatigue" after several hours of direct and cross examination.  In United States v. Spangler, 638 F. App'x 611, 613 (9th Cir. 2016), the Ninth Circuit held that the district court's time limit on defense counsel's cross examination did not violate the Sixth Amendment where defense counsel had "fair warning" that his time would be limited and "was able to question [the witness] about matters of bias."

Here, the deposition transcript makes clear that defense counsel not only had the opportunity to explore Mr. Battaglia's motivations, biases, veracity, and recollection, but took full advantage of that opportunity over the course of his 90 minutes, repeatedly challenging Mr. Battaglia's versions of events and questioning his memory.  The jury in this case will have more than sufficient information to "appraise the biases and motivations" of Mr. Battaglia.  The Sixth Amendment requires no more.

## V.   CONCLUSION

Defendant was given ample opportunity to cross-examine Mr. Battaglia, and the time limit imposed on his cross-examination was clearly reasonable in light of Mr. Battaglia's health and prognosis. That the defense would have preferred to spend two or more days aggressively cross-examining the victim in this case is not grounds for excluding Mr. Battaglia's deposition testimony altogether. Defendant's motion should be denied.