E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
KRISTIN N. SPENCER (Cal Bar. No. 294692)
MELISSA S. RABBANI (Cal. Bar No. 283993)
Assistant United States Attorneys
Santa Ana Branch Office
     8000 United States Courthouse
     411 West Fourth Street
     Santa Ana, California 92701
     Telephone: (714) 338-3500
     Facsimile: (714) 338-3708
     E-mail:    kristin.spencer@usdoj.gov
                melissa.rabbani@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>            v.<br><br>JAMAL NATHAN DAWOOD,<br>    aka "Jimmy Dawood,"<br><br>            Defendant. | No.  SA CR 23-38-JVS<br><br>DECLARATION OF MELISSA S. RABBANI IN SUPPORT OF GOVERNMENT'S OPPOSITION TO MOTION TO EXCLUDE DEPOSITION TESTIMONY |

I, Melissa S. Rabbani, declare as follows:

1.   I am an Assistant United States Attorney in the United States Attorney's Office for the Central District of California and one of the attorneys representing the United States in this matter. I have personal knowledge of the following facts, and if called and sworn as a witness, would completely testify thereto.

2.   After the court granted the government's application for a deposition of Mr. Battaglia, the parties agreed to schedule Mr.

1  Battaglia's deposition for September 29, 2023.

2      3.   On or about September 28, 2023, I learned that Mr.

3  Battaglia had been admitted to the Intensive Care Unit and was unable

4  to be interviewed or deposed.  I emailed defense counsel that day to

5  reschedule the deposition.

6      4.   The parties ultimately agreed to reschedule the deposition

7  for October 17, 2023.  The deposition did go forward that day in Mr.

8  Battaglia's hospital room in Orange, California.  Mr. Battaglia

9  received oxygen support throughout the deposition.

10     5.   Attached hereto as **Exhibit A** is a true and correct copy of

11 the transcript of Mr. Battaglia's deposition.

12     6.   The government will lodge as **Exhibit B** a true and correct

13 copy of the video recording of Mr. Battaglia's deposition.

14     7.   On November 3, 2023, FBI Special Agent Julie Sawyer called

15 me to inform me that Mr. Battaglia's family friend had just advised

16 her that Mr. Battaglia had passed away that morning.

17     I declare under penalty of perjury that the foregoing is true

18     and correct to the best of my knowledge.

19     Executed on January 16, 2024, at Santa Ana, California.

20

21                            /s/ *Melissa S. Rabbani*
                              MELISSA S. RABBANI

22                            Assistant United States Attorney

23

24

25

26

27

28

Exhibit A

CERTIFIED TRANSCRIPT

# U.S.A.

VS.

# DAWOOD

---

# THOMAS BATTAGLIA

*October 17, 2023*

---



**JONNELL AGNEW & ASSOCIATES**
(800) 524-DEPO

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1              UNITED STATES DISTRICT COURT

2          FOR THE CENTRAL DISTRICT OF CALIFORNIA

3

4    UNITED STATES OF AMERICA,    )
                                  )        **CERTIFIED
5                 Plaintiff,      )        TRANSCRIPT**
                                  )
6          vs.                    )   No.
                                  )   8:23-CR-00038-JVS
7    JAMAL NATHAN DAWOOD,         )
                                  )        VOLUME I
8                 Defendant.      )     Pages 1 - 134
     _____)

9

10

11

12

13

14

15          VIDEOTAPED DEPOSITION OF THOMAS BATTAGLIA,

16   taken on behalf of the Plaintiff, at

17   Providence St. Joseph's Hospital, 1100 West Stewart

18   Drive, Orange, California, commencing at 12:13 P.M.,

19   on Tuesday, October 17, 2023, pursuant to Court

20   Order, before ANDREW T. HA, CSR No. 14537, a

21   Certified Shorthand Reporter, in and for the County

22   of Los Angeles, State of California.

23                        * * *

24

25

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

```
 1   APPEARANCES:

 2       For the Plaintiff:

 3           UNITED STATES ATTORNEY'S OFFICE
             BY:   MELISSA S. RABBANI, ESQ.
 4                 KRISTIN N. SPENCER, ESQ.
             411 West 4th Street
 5           Suite 8000
             Santa Ana, California  92701
 6           (714) 338-3500
             (714) 338-3561 (Fax)
 7           melissa.rabbani@usdoj.gov
             kristin.spencer@usdoj.gov
 8
         For the Defendant:
 9
             LAW OFFICES OF VICTOR SHERMAN
10           BY:   VICTOR SHERMAN, ESQ.
             11400 West Olympic Boulevard
11           Suite 1500
             Los Angeles, California  90064
12           (424) 371-5930
             (310) 392-9029 (Fax)
13           victor@victorsherman.law

14       Also Present:

15           Alan Hernandez, videographer
             Caroline Agan, FBI agent
16           Rachel Regnier, paralegal for defense
             Jamal Nathan Dawood, defendant
17

18

19

20

21

22

23

24

25
```

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1                          I   N   D   E   X

2

3  WITNESS                    EXAMINATION                PAGE

4  Thomas Battaglia         By Ms. Rabbani          5, 130

5                           By Mr. Sherman             50

6

7

8                        E X H I B I T S

9

   DEFENDANT'S                                        PAGE
10
   Exhibit 1   Apartment Deed (8)                      86
11
   Exhibit 2   Petition and Order (5)                  90
12
   Exhibit 3   Residential Purchase Agreement (8)      94
13
   Exhibit 4   Disbursement Summary (1)                97
14
   Exhibit 5   Amended Declaration of Trust (24)      109
15
   Exhibit 6   Declaration of Trust (20)              105
16
   Exhibit 7   FBI Interview (3)                      118
17
   Exhibit 8   Text Messages (1)                      127
18

19

20          QUESTIONS INSTRUCTED NOT TO ANSWER

21                        None.

22

23              INFORMATION REQUESTED

24                        None.

25

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

```
 1    ORANGE, CALIFORNIA; TUESDAY, OCTOBER 17, 2023
 2                   12:13 P.M.
 3         THE VIDEOGRAPHER:  We are on the record.
 4  Today's date is October 17, 2023.  The time is
 5  12:13 A.M.[sic] Pacific Time.  My name is          PM    12:13:39
 6  Alan Hernandez.  I am a notary public contracted by
 7  Jonnell Agnew & Associates.  I'm not financially
 8  interested in this action or a relative of any attorneys
 9  or any of the parties.  This deposition is taking place
10  at Providence Saint Joseph Hospital located at 1100 West PM  12:13:55
11  Stewart Drive, Orange, California 92868.
12         The name of the case is United States of
13  America v. Jamal Nathan Dawood aka Jimmy Dawood, filed
14  in United States court for the central district of
15  California, southern division.  The case number is    PM    12:14:21
16  8:23-CR-00038-JVS.
17         Will all attorneys present please identify
18  yourselves and state who you are representing for the
19  record, please.
20         MS. RABBANI:  Melissa Rabbani with the United  PM    12:14:42
21  States attorney's office.
22         MS. SPENCER:  And Kristin Spencer with the
23  United States attorney's office.
24         MR. SHERMAN:  Victor Sherman representing
25  Mr. Dawood who is present in court.  Also with me is my PM  12:14:56
```

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

```
 1   paralegal, Rachel Regnier.
 2           MS. RABBANI:  And also here with the
 3   Government is FBI Special Agent Caroline Agan
 4   A-G-A-N.
 5           THE VIDEOGRAPHER:  The court reporter today      12:15:11PM
 6   is Andrew T. Ha representing Jonnell Agnew &
 7   Associates.  Will the reporter please swear in the
 8   deponent and we can begin.
 9                   THOMAS BATTAGLIA,
10           called as a witness by and on
11           behalf of the Plaintiff, being
12           first duly sworn, was examined and
13           testified as follows:
14                   EXAMINATION
15   BY MS. RABBANI:                                          12:15:41PM
16       Q.  Good afternoon, Mr. Battaglia.
17       A.  Good afternoon to you.
18       Q.  How are you doing today?
19       A.  I'm fine.  Thank you.
20       Q.  Can you state your name for the record?         12:15:47PM
21       A.  Thomas Michael Battaglia.
22       Q.  And Mr. Battaglia, how old are you today?
23       A.  82.
24       Q.  82.
25           We're in the hospital today; is that right?     12:15:59PM
```

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

```
 1        A.    That's correct.
 2        Q.    And you've been hospitalized for some time
 3   now?
 4        A.    Yes.
 5        Q.    How long approximately have you been in the    12:16:04PM
 6   hospital?
 7        A.    Little over two months.
 8        Q.    Okay.  Can you just briefly describe what's
 9   been going on with your health these last two months?
10        A.    Last two months basically had a minor stroke   12:16:16PM
11   and a heart attack, and these are under control now.
12   Very very minimal restrictions noted.  Extremely
13   minimal.
14             MR. SHERMAN:  I'm sorry.  I didn't hear that
15   last bit.                                                 12:16:40PM
16             THE WITNESS:  I have very minimal
17   restrictions that were given to me.  I have none.
18   Really basic.  I do everything, except a little
19   immobile.  They're working on that, to get me
20   stronger on the legs.  I do have neuropathy, and I am     12:17:01PM
21   a diabetic.
22   BY MS. RABBANI:
23        Q.    During this time that you've been in the
24   hospital, have you had any periods where you've been
25   a little confused or a little out of it?                  12:17:14PM
```

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

```
 1       A.   Not really.
 2       Q.   Not really.  And how about today?  How are
 3   you feeling mentally?
 4       A.   I'm feeling fine.  Thank you.
 5       Q.   I'm going to ask you today about your          12:17:23PM
 6   relationship with Jimmy Dawood.  Do you know
 7   Jimmy Dawood?
 8       A.   Yes.
 9            MR. SHERMAN:  I'd like to interrupt.  I'll
10   object for continuing the deposition today at all       12:17:34PM
11   under Rule 15 because the witness has indicated he's
12   feeling fine, he's not confused.  Apparently he has
13   very minimal restrictions according to his own
14   testimony.  He can do everything.  He's a little bit
15   less mobile than he normally is.  He seems in good      12:17:48PM
16   health other than lying -- laying in his hospital
17   bed, so I don't see any need to even continue the
18   deposition.
19            THE WITNESS:  Could you speak up, please.
20            MR. SHERMAN:  I'm sorry.                        12:18:02PM
21            THE WITNESS:  A little bit.
22            MR. SHERMAN:  Yes.
23            THE WITNESS:  That'll be great.
24            MR. SHERMAN:  Can you hear me now?
25            THE WITNESS:  I can hear you better.            12:18:07PM
```

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1          MR. SHERMAN:  Too loud for you?  Okay.

2          It appears that there's no reason to

3    continue with the deposition because the original

4    allegation was, when the Rule 15 motion was filed,

5    basically that he was on his death bed, and unless we          12:18:20PM

6    took the deposition right away, he might die before

7    trial.  It doesn't appear that he's in that medical

8    condition at this point, and whatever problems he had

9    with a stroke and a heart attack have been minimized,

10   mitigated by his hospital stay.  So I think that          12:18:38PM

11   whatever may have been the Government's opinion at

12   the time they ruled -- they made the Rule 15

13   motion -- doesn't exist today.

14          And the Government had refused to provide

15   any medical records for the Court to review before          12:18:52PM

16   the Court granted the Rule 15 motion.  So I submit

17   that the Government has not fully informed the judge

18   as to what his medical condition was then and

19   certainly not what it is now, so I will object to any

20   Rule 15 deposition at all at this point.          12:19:11PM

21          Apart from that, before we started the

22   deposition today -- and I assume the Government's

23   going to proceed regardless of my objection -- but I

24   want to preserve for the record that we had certain

25   ground rules, and I'm prepared to state what the          12:19:26PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

```
 1   ground rules or --
 2           MS. RABBANI:  I will do that.
 3           MR. SHERMAN:  Okay.
 4           MS. RABBANI:  Counsel, your objections are
 5   noted.  We will go forward.  The Court has the full      12:19:31PM
 6   record and we can litigate this later.
 7   BY MS. RABBANI:
 8       Q.  As for ground rules, Mr. Battaglia, we
 9   talked about this.  We have a court order letting us
10   do the deposition today.  We are limited to three      12:19:43PM
11   hours on the record, so I'm going to ask you
12   questions for about 90 minutes, and then
13   Mr. Sherman -- who's here representing
14   Jimmy Dawood -- he's going to ask you questions for
15   the last 90 minutes.                                   12:19:56PM
16           So this is true in every deposition, but
17   it's particularly true for you because we're in the
18   hospital, any time you need a break, you let us know.
19   Whether it's me asking you questions, whether it's
20   Mr. Sherman, and we'll take a break and go off the     12:20:08PM
21   record and get you whatever you need.  Try not to do
22   it if there's a question pending.  Try to just answer
23   the question, and then ask for the break.  But if you
24   need it, you need it.  Does that sound okay?
25           THE WITNESS:  Sounds fine.                     12:20:23PM
```

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1      **Q.   Any time you can't understand a question,**
2  **you can ask for the question to be rephrased.  You**
3  **can say you don't understand.  Does that make sense?**
4      A.   Yes, it does.
5      **Q.   And if you do answer a question, we're just**    12:20:34PM
6  **going to assume you understand the question.  Is that**
7  **fair?**
8      A.   Correct.  That's fair.
9          MR. SHERMAN:  I think there was additional
10  ground rules in that the idea was that the Government    12:20:43PM
11  agrees that, whatever questions asked today, there
12  can be objections to the form of the question to
13  preserve the record for the possibility of litigating
14  that before the judge at a later time, if it gets to
15  that, but Mr. Battaglia will be required to answer    12:20:58PM
16  the question even if there's an objection.
17          I also want to put on the record that I
18  understand there's the three-hour time limit that was
19  proposed by the Government to the judge based upon
20  the medical condition of the witness, which seemed    12:21:14PM
21  very dire at the time they made that request.  I
22  appreciate the Government's going to take only an
23  hour and a half today, but I will state that, in
24  preparing for the cross-examination today, there is
25  no way the defendant can successfully cross-examine,    12:21:29PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1    through his lawyer, Mr. Battaglia within an hour and
2    a half period, that my cross-examination, based on
3    the voluminous amount of material in this case, will
4    take much longer than an hour and a half, regardless
5    of how long it takes the Government.                    12:21:47PM
6        The Government has indicated to me that if I
7    need more time I should make an ex parte motion with
8    the Court and let the Court decide.  But it's my
9    understanding that three hours based solely on the
10   medical condition of the defendant and was not        12:22:01PM
11   intended to restrict the ability of the defendant to
12   properly defend himself.
13       THE WITNESS:  I'd like to correct your
14   pronunciation of my name.  It's Thomas Michael
15   Battaglia, a silent "G."                               12:22:16PM
16       MR. SHERMAN:  I apologize.
17       THE WITNESS:  That's not a problem.
18       MS. RABBANI:  Counsel, your objections are
19   noted.  I understand that you're objecting to the
20   fact that we're doing the deposition today.  You're   12:22:25PM
21   objecting to the time limit.  We will respond to
22   those separately.
23       Going forward, can we just stipulate no
24   speaking objections.  We'll do quick objections to
25   form.                                                  12:22:35PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

```
 1              MR. SHERMAN:  Don't you believe that I
 2   should have put my objection in the --
 3              MS. RABBANI:  I do.
 4              MR. SHERMAN:  Well, I don't think they were
 5   speaking objections.                                  12:22:41PM
 6              MS. RABBANI:  Going forward.
 7              MR. SHERMAN:  They explain the situation.  I
 8   will certainly try to limit my objections as much as
 9   possible.
10              MS. RABBANI:  Okay.  Much appreciated.      12:22:50PM
11   BY MS. RABBANI:
12       Q.   Okay.  Mr. Battaglia, I'm going to -- as I
13   was saying, I'm going to ask you questions today
14   about your relationship with Jimmy Dawood.
15       A.   Yes.                                          12:22:57PM
16       Q.   Do you know Jimmy Dawood?
17       A.   Yes.
18       Q.   And do you see him here today in the room
19   with us?
20       A.   Hard to see him at all.                       12:23:03PM
21       Q.   But you recognize him here?
22       A.   I recognize him here.
23       Q.   Okay.  And do you have any trouble
24   remembering your relationship with Jimmy Dawood?
25       A.   Not at all.  Absolutely not.                  12:23:17PM
```

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1    Q.   Okay.  Did you have a brother named
2  Jack Battaglia?
3    A.   Yes, I did.
4    Q.   Can you describe your relationship with
5  Jack?                                                    12:23:26PM
6    A.   Very close.  Wonderful brother.  He spoke
7  seven languages fluently.  He was also a concert
8  pianist.  A bit of a intellectual wiz, extremely
9  intelligent.  And we were very very close.  As
10 brothers.  Only brothers that we had in the family.      12:23:46PM
11 Just he and I.
12   Q.   And did Jack pass away a few years ago?
13   A.   Yes.
14   Q.   And when was that?  Do you remember?
15   A.   It was July the 13th of 2019.                     12:23:57PM
16   Q.   And when Jack died, did he leave you
17 anything in his estate?
18   A.   He left me virtually everything.
19   Q.   And can you -- was there money?  Like, just
20 cash in an account?                                      12:24:12PM
21   A.   There was cash that I knew of.
22   Q.   And how much money was that?
23   A.   Well, approximately -- it was actually one
24 million and five dollars.  From Cetera.  That was the
25 Putnam fund.  And Los Angeles.                           12:24:31PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1        Q.   And did he leave you any properties?

2        A.   Yes.  His home, 2416 Calle Aquamarina, in

3   San Clemente.  And two properties in Honolulu,

4   Hawaii, at the Luana and is known as 2416.  Kalakaua.

5   Kalakaua Avenue in Honolulu.  And the units in          12:25:09PM

6   question were unit 906 and unit 1103.

7        **Q.   And were those Hawaii properties, were those**

8   **condominiums?**

9        A.   They were called condominium suites.  They

10  were suites, not condominiums.                          12:25:29PM

11       **Q.   Okay.  And were those bringing in rental**

12  **income?**

13       A.   Absolutely.  A significant number of dollars

14  coming in every month because they were totally

15  rented all the time.                                    12:25:42PM

16       **Q.   The house that you mentioned on Aquamarina,**

17  **is that where your brother lived?**

18       A.   That's correct.  That was his home.

19  Principle home.

20       **Q.   And after your brother died and you**         12:25:52PM

21  **inherited this money and these properties what did**

22  **you want to do with the estate?**

23       A.   Basically to promote goodwill, to donate

24  certain amounts to friends and relatives and

25  charitable funds as well.                               12:26:16PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1          MR. SHERMAN:  I'm sorry.  I didn't hear
2    that.
3          THE WITNESS:  Friends and relatives and
4    charitable funds.
5          MS. RABBANI:  Charitable funds.                    12:26:26PM
6          THE WITNESS:  Charitable.  Sorry about that.
7          MR. SHERMAN:  I'm sorry.
8    BY MS. RABBANI:
9      Q.  Did you want to sell the Aquamarina house?
10     A.  Yes.                                               12:26:37PM
11     Q.  And did you want to keep renting out the two
12   properties in Hawaii?
13     A.  Absolutely.
14     Q.  How did you meet Jimmy Dawood?
15     A.  Well, I was referred to Jim Dawood from a          12:26:47PM
16   friend of a friend of my brother's actually.  And he
17   referred him as an individual who could help me sell
18   the property, repair it, fix it up, and do whatever's
19   necessary for the sale of the property.
20         And basically I didn't investigate his            12:27:14PM
21   background or anything.  But I took it as fair value.
22   It was an honest representation straightforward to me
23   by a friend of a friend of my brother's.  Normally
24   with my background in human resources of
25   approximately 50 years I would check anyone referred    12:27:39PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1    to me, but I didn't because it came through this

2    distant friend.  So that being the case, he was

3    introduced to me, and basically he said I can help

4    you because --

5            MR. SHERMAN:  This point I would object as a      12:28:06PM

6    narrative, and I would ask the Government ask the

7    next question --

8            MS. RABBANI:  I'll ask another question.

9            MR. SHERMAN:  -- rather than just continue

10   with the narrative.                                       12:28:18PM

11   BY MS. RABBANI:

12       Q.   **When you say you wanted to get help**

13   **repairing and fixing up and selling the property, you**

14   **mean the Aquamarina house; is that correct?**

15       A.   That's correct.  His domicile.                   12:28:27PM

16       Q.   **And when you met Jimmy Dawood, was this**

17   **shortly after your brother died?**

18       A.   Yes.

19       Q.   **So it was in that summer of 2019?**

20       A.   Yes.  Within weeks.  And also I was in the       12:28:38PM

21   hospital with the small operation of a stent being

22   put in my body.  A stent.  You know what a stent is?

23       Q.   **In the heart?**

24       A.   It was by the heart.

25       Q.   **Okay.**                                        12:28:58PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

```
 1      A.   Yeah.  So I had that done.  And then
 2  subsequently he passed away on the 13th of the year
 3  2019.
 4          MR. SHERMAN:  Excuse me.  I misunderstood.
 5  Did you say you had the stent or your brother had the    12:29:16PM
 6  stent?
 7          THE WITNESS:  I had the stent.
 8          MR. SHERMAN:  I'm sorry.  Okay.  Thank you.
 9  BY MS. RABBANI:
10      Q.   And how did Jimmy Dawood introduce himself      12:29:22PM
11  to you?
12      A.   As someone who could, quote, unquote, help
13  restore my brother's property to full salable
14  condition.  And --
15      Q.   Go ahead.                                       12:29:40PM
16      A.   -- and that the proceeds would be given to
17  me upon the sale of said property.
18      Q.   Did you agree that he would take any kind of
19  fee?
20      A.   No.  We didn't agree on any fee.               12:29:57PM
21      Q.   Okay.  Did you discuss whether he'd be paid
22  some portion of the proceeds of the sale?
23      A.   No.
24      Q.   Did you talk about any payment for
25  Mr. Dawood at all?                                       12:30:10PM
```

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

```
 1        A.    I don't recall that.
 2        Q.    Okay.  So did you agree that he would help
 3   you manage that Aquamarina property?
 4        A.    Manage in what sense?
 5        Q.    Get it ready for sale and then sell it.        12:30:24PM
 6        A.    If that's the indication you have, that
 7   would be correct.
 8        Q.    Did he tell you that he would take care of
 9   the mortgage payments for the Aquamarina house?
10        A.    Absolutely yes.                                12:30:36PM
11        Q.    And did he tell you he would take care of
12   the homeowner's association fees?
13        A.    Yes.  And taxes.
14        Q.    Okay.  And taxes.
15        A.    And any income rentses that occurred.          12:30:47PM
16        Q.    And he told you he'd paid any other bills
17   with the Aquamarina house?
18        A.    Yes.  We discussed that at length and he
19   indicated that he would pay and he would have his
20   wife pay these subsequent fees that were due on said    12:31:02PM
21   property.
22        Q.    Did you and Mr. Dawood ever put this
23   agreement you had between you in writing?
24        A.    I asked for it.  I never got it.
25        Q.    You asked him to put it in writing?            12:31:19PM
```

1     A.   Several times.

2     **Q.   What he was going to do for you?**

3     A.   And I never had any contract, never any

4  inkling of his involvement in selling the property,

5  repairing the property, doing anything to enhance the          12:31:36PM

6  sale of my brother's home.

7     **Q.   So at the outset, your understanding was**

8  **that he was going to make repairs to the Aquamarina**

9  **house, get it ready for sale, and sell it.  Is that**

10 **fair?**                                                        12:31:51PM

11    A.   That is correct.

12    **Q.   And did you have any discussions with him**

13 **about the cash that you had?**

14    A.   No.

15    **Q.   Did you have any discussions with him about**        12:31:57PM

16 **the Hawaii properties?**

17    A.   Yes.

18    **Q.   And what was that?**

19    A.   That was basically he was going to deposit

20 said properties -- the two properties 906 and 1103 --          12:32:06PM

21 into his funds.  One was I remember the name

22 "Global."  It was "Global."  And if I heard the

23 second name, I would affirm it of the other property

24 be put into another fund that he owned.

25    **Q.   When you say, "Global," does**                        12:32:32PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1   **Global Design Build sound familiar?**

2       A.   That probably sounds familiar.

3       **Q.   And for the --**

4       A.   I can't establish that as being the actual

5   fact, but it sounds correct.                          12:32:43PM

6       **Q.   You just remember that "Globe" was in the**

7   **name?**

8       A.   "Global."

9       **Q.   "Global."  How about Medline Management?**

10  **Does that sound familiar?**                          12:32:51PM

11      A.   That may have been expressed maybe once or

12  twice.

13      **Q.   TD Capital?**

14           MR. SHERMAN:  Well, I would object that the

15  Government is leading the witness.  So I object to      12:33:04PM

16  the form of the question.

17           MS. RABBANI:  It's like a two-word question.

18  BY MS. RABBANI:

19      **Q.   Does TD Capital sound familiar?**

20      A.   Sounds a little familiar.                      12:33:13PM

21      **Q.   Okay.  And when you say he's going to**

22  **deposit the Hawaii properties, do you mean he was**

23  **going to take the rental income from the Hawaii**

24  **properties and put them into his own accounts?**

25      A.   No.  He never said that.  He never said       12:33:27PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1    that.

2        Q.   Did he say he was going to transfer

3    ownership of the Hawaii properties to his own

4    companies?

5        A.   He said that -- that's a little fuzzy.  A          12:33:37PM

6    little fuzzy.  Hard to recall that specific.

7        Q.   Okay.

8        A.   Restate that question.

9        Q.   Did he tell you that he was going to

10   transfer the ownership of those Hawaii properties to      12:33:56PM

11   some other entity?

12       A.   Temporarily.

13       Q.   Okay.

14       A.   That's right.  He said temporarily.  So that

15   he could put me in the best position regarding the         12:34:08PM

16   disposition of those properties going forward.

17       Q.   So he told you that he was going to transfer

18   ownership of the two Hawaii properties to some other

19   entity to benefit you; is that right?

20       A.   Yes.  And that, basically, all of that would      12:34:28PM

21   be returned to me for my total disposition at

22   approximately 30 days, is what I recall.

23       Q.   So was it your understanding that after some

24   period, maybe 30 days ownership of the Hawaii

25   properties, would be transferred back to you?              12:34:51PM

1    A.    That's correct.

2    **Q.    How about that Aquamarina house?  Did he**

3    **ever tell you to transfer ownership of that**

4    **Aquamarina house?**

5    A.    Never.                                          12:35:01PM

6    **Q.    Never?**

7    A.    No never.

8    **Q.    Okay.  For the Hawaii properties, did he**

9    **have you sign anything transferring the ownership?**

10   A.    Never.                                          12:35:08PM

11   **Q.    I want to go back to the retirement savings,**

12   **which I think you said was about a million?**

13   A.    Well, let me expand on that.  That was from

14   one fund that my brother owned.  And that was through

15   Putnam fund in Los Angeles.  It's the fund known as    12:35:29PM

16   Cetera C-E-T-E-R-A.  Cetera fund.  And at that time

17   it was held Nahigian, who was the principle of that

18   fund.  He subsequently has passed away and his son

19   has taken over.  Steven Nahigian.

20   **Q.    Okay.**                                        12:35:54PM

21   A.    Okay?  And my brother and I have known the

22   Nahigians for many many years.  And he's the one that

23   transferred one million and five dollars into the --

24   believe it was the Bank of America account.

25   **Q.    Okay.**                                        12:36:15PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1    A.   Then also Pierre Ngo N-G-O was

2  Financial Strategies, was another entity that my

3  brother had a subsequent amount of almost three

4  quarters of a million dollars into also, and they

5  sold those funds per his instructions back to            12:36:39PM

6  Bank of America.

7    **Q.   Okay.**

8    A.   And Caltech Federal Credit Union did also.

9  We were members of Caltech.  Caltech Federal Credit

10 Union.                                                    12:37:06PM

11   **Q.   So when we're talking about the cash that**

12 **was in Jack's estate, it's somewhere around 1.2, 1.3**

13 **million?**

14   A.   Much more than that.  Much much more.

15   **Q.   Did you have a sense of how much?**            12:37:20PM

16   A.   Well, it was 75,000 that he asked me to

17 transfer from Union Bank.  He asked for the

18 property's contents to be given to a fellow by the

19 name of Roger Bark -- "Bark-say-jyan," I believe, is

20 how you pronounce it.  "Barksedarian" or               12:37:47PM

21 "Bark-say-jyan."  So he came in with a couple of

22 trucks and virtually emptied out the contents of the

23 house, the office, the -- everything in the kitchen,

24 the etageres, all of the furniture, and cash money as

25 well.                                                     12:38:20PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

```
 1      Q.   When you're talking about things being
 2   removed from the house, is that Jack's Aquamarina
 3   house?
 4      A.   That's correct.
 5      Q.   And who removed all the stuff from the --        12:38:26PM
 6   inside the house?
 7      A.   His name is Roger Bardakjian or some call it
 8   "Barksedarian."  But I call it "Bark-say-jyan."
 9   Roger Bardakjian.
10      Q.   And did you ask him to do that?                  12:38:41PM
11      A.   Absolutely not.  Never.
12      Q.   Do you know who had him -- did you have any
13   understanding --
14      A.   I had assumed it was Jim Dawood.
15      Q.   Did you ever see any proceeds from the           12:38:52PM
16   things that were taken?
17      A.   Absolutely nothing.  Zero.
18           MR. SHERMAN:  By the way, just for the
19   record, I assume obviously I'll object on hearsay
20   grounds.  We're preserving those objections.  But        12:39:02PM
21   this is the first time I want to make that objection
22   so in the future I won't have to interrupt.  And
23   anything based upon hearsay may be agreed that I do
24   not have to object at that moment on the grounds of
25   hearsay, but I'm preserving that --                      12:39:17PM
```

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1          MS. RABBANI:  Yes.

2          MR. SHERMAN:  Thank you.

3     BY MS. RABBANI:

4          **Q.   Do you remember when the things were taken**

5     **out of the house?**                                   12:39:23PM

6          A.   Well, it was subsequent dates.

7          **Q.   Okay.**

8          A.   Week after week after week after week.

9          **Q.   Did it start after you met Mr. Dawood?**

10         A.   Oh yes.                                        12:39:31PM

11         **Q.   And did Mr. Dawood have access to that**

12    **house?**

13         A.   Yes.

14              (Whereupon there was a brief

15              cellphone interruption in the                  12:39:35PM

16              proceedings.)

17              MR. SHERMAN:  Excuse me.  If you need to

18    answer it, we can go off the record.

19              MS. RABBANI:  I think it's gone.

20              MR. SHERMAN:  I have the same problem.         12:40:05PM

21              THE WITNESS:  Now it's off.  Sorry about

22    that.

23    BY MS. RABBANI:

24         **Q.   All right.  Going back to the cash, did**

25    **Jimmy Dawood tell you that you should put that money** 12:40:14PM

1  in a trust account?

2      A.   Not specifically a trust account, but a

3  special fund or funds, plural, depending upon

4  whichever properties were involved.  They would be

5  put into a special holding account to be held in          12:40:35PM

6  trust for me, and at some future date all of this

7  would be come back -- would come back to me.

8      Q.   Did he go with you to open a bank account?

9      A.   Yes.

10      Q.   And where did you go?                            12:40:55PM

11      A.   In San Clemente, the Pico branch of

12  Bank of America.

13      Q.   And you two went together to a

14  Bank of America branch?

15      A.   Uh-huh.  That's correct.                         12:41:09PM

16      Q.   And you opened an account?

17      A.   Yes.

18      Q.   Okay.

19      A.   He was sitting right next to me, and I

20  claimed, "Am I the only recipient of basically            12:41:17PM

21  accessing this money?"  And he said absolutely.  He

22  said I can't touch a penny of it.

23      Q.   And how much money went in --

24      A.   That was not true.

25      Q.   How much money went into that account?  Just     12:41:32PM

1    roughly.  Do you remember?  Was it over a million?

2        A.   Much more.

3        Q.   Okay.

4        A.   Because it came in from three funds.

5        Q.   And did you start transferring the rental          12:41:45PM

6    income from Honolulu into that account?

7        A.   No.  Because he alleged that he had control

8    of the property's evaluation going into his holding

9    companies, Global and those other two that you

10   mentioned.                                                  12:42:09PM

11       Q.   Did Mr. Dawood tell you that you would need

12   to put extra money into that account to cover some of

13   the repairs?

14       A.   No.  Never.

15       Q.   Okay.  When you were there at the                  12:42:18PM

16   Bank of America branch, did the bank give you

17   information on how to access the account?

18       A.   General information that it was going to be

19   held in trust for me, and basically I understood it

20   as specifically for me and no one else.                    12:42:45PM

21       Q.   Did you ever learn how to log onto the bank

22   account online?

23       A.   No.

24       Q.   On your phone or computer?

25       A.   No, I did not.                                     12:42:57PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1    Q.   Did Mr. Dawood know how to do that?

2    A.   Yes.  And I asked him several times to

3  assist me with that, and that never got -- that never

4  happened.  Never at all.

5    Q.   **Were you the only authorized signer on that**    12:43:11PM

6  **account?**

7    A.   According to the banker, I was.

8    Q.   **Okay.**

9    A.   His name was Kim.  I don't know if he's

10  still there at that branch.  I don't know.    12:43:24PM

11       May I have a sip of water.  Small cup.

12  Good.  Excellent.

13    Q.   **Do you want to take a break, Tom, or do you**

14  **want to keep going?**

15    A.   Thank you.  Proceed.    12:43:43PM

16    Q.   **So I think I asked this, but I just want to**

17  **make sure:  Did you at any time, back in 2019 or**

18  **couple of years later, did you ever access that bank**

19  **account online?**

20    A.   No, I never did.    12:44:07PM

21    Q.   **Okay.**

22    A.   I didn't know how to.  Honestly, I will

23  admit that I'm not that computer savvy with these --

24  with these instruments, these phones and computers.

25  They keep changing and I keep trying to understand    12:44:21PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

```
 1   them.
 2        Q.    They do.
 3        A.    Difficult.
 4        Q.    So after the account was set up, did
 5   Mr. Dawood start to take money out of the account?    12:44:31PM
 6        A.    I don't know.
 7        Q.    You don't know?
 8        A.    I don't know.
 9        Q.    Did he --
10        A.    He alleged that he couldn't.             12:44:38PM
11        Q.    Uh-huh.
12        A.    But then subsequently I found that he could
13   and did from the bankers of Bank of America.
14        Q.    Did he tell you that he was spending money
15   making improvements on Aquamarina house?             12:44:54PM
16        A.    Some.
17        Q.    Did he tell you specifically what he was
18   doing?
19        A.    That he was going to take funds to repair
20   the property, and he did say that it was going to be  12:45:09PM
21   in excess of a million dollars.  I subsequently have
22   an individual who builds homes who said, "Nonsense."
23   He went in there and looked at the alleged repairs
24   and said, "Absolutely nonsense.  This is a huge huge
25   overexaggeration of what was going on in that         12:45:33PM
```

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1   property, the repairs that were being made."

2       **Q.   Did Mr. Dawood ever show you receipts or**

3   **photos of any --**

4       A.   Never.  I asked him.  Never.  Nothing with

5   his handwriting on it.  No -- nothing in writing.  No        12:45:49PM

6   memo.  No nothing.  And I asked for it repeatedly, ad

7   nauseam, over and over and over again.  "Oh, I'll get

8   it to you."  "Oh, we'll mail it to you."  "Oh, my

9   computer's down."  "Oh, my copier is down."  "Oh I

10  forgot it."  "Oh, I'll get it to you."  Never            12:46:09PM

11  happened.  That was very frustrating.  And it was

12  kind of the turning point of my belief in his

13  testimony to me.

14      **Q.   Did Mr. Dawood ever tell you that he was**

15  **taking money out of that account to invest in other**       12:46:27PM

16  **projects?**

17      A.   Never.

18      **Q.   And did you ever tell Mr. Dawood that you**

19  **wanted to invest some of that money?**

20      A.   Never.                                              12:46:38PM

21      **Q.   Did you want to invest that money?**

22      A.   Never.

23      **Q.   Did Mr. Dawood ever have you sign checks**

24  **that you remember?**

25      A.   He had me sign some documents, but the --          12:46:49PM

1  the contents of the documents, what they were for,

2  were always obliterated, and it was just, "Sign here.

3  This is here to protect you."  He would say over and

4  over again.  "What am I signing this for?"  "To

5  protect you.  To save the funds in this account to      12:47:07PM

6  protect you, Tom.  You must sign this."  So I did.

7      **Q.**  **Do you remember how many times that**

8  **happened, that he had you sign documents?**

9      A.  Under 12.

10     **Q.**  **And were some of those --**                      12:47:27PM

11     A.  Maybe 12-13 times.

12     **Q.**  **-- were some of those contracts?**

13     A.  They were alleged to be.  Just basic

14 information that he needed to coordinate things on my

15 behalf, to protect me again.  That was always the       12:47:45PM

16 center of the objections from him.  "I'm here to

17 protect you."  "I'm here to invest this."  "Please

18 sign here.  This is what you need to do."  So I never

19 questioned any of this.  I assumed that everything

20 was according to hoil (phonetic), according to the      12:48:12PM

21 correct modality of handling business.  I don't know.

22     **Q.**  **Do you remember the bank ever calling you to**

23 **authorize a wire transfer out of that account?**

24     A.  They did call me.

25     **Q.**  **And what happened?**                                12:48:30PM

1    A.   Lady called me and she said, "Do you realize

2  that money's being taken from your account?  We think

3  it's fraud."  She quoted me.  I said, "You do?"  She

4  said, "Yes, we do.  Are you taking money?"  I said,

5  "No, I'm not.  I haven't taken a penny of any of it."    12:48:50PM

6  She said, "Well, there's a substantial amount.  We

7  will prove it to you."

8         And she sent a representative who came to my

9  home, knocked on my door, came into my house, invited

10  her in, and told me that a significant amount --           12:49:05PM

11  several times -- of money, huge amounts of money --

12  were taken from the account.  And then, "We're down

13  to this.  We're down to this.  Down to this."  I

14  said, "Oh, my God."  I said, "I had no idea."

15    **Q.   You were surprised?**                              12:49:28PM

16    A.   Shocked.

17    **Q.   Do you remember when this happened?  Would**

18  **it have been at the end of your relationship with**

19  **Mr. Dawood?**

20    A.   Toward the end.                                     12:49:38PM

21    **Q.   Okay.  Before this call and the fraud**

22  **examination, do you remember whether the bank ever**

23  **called you and said, "Can you sign off on this wire**

24  **transfer?"**

25    A.   No.                                                 12:49:49PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1    Q.   You don't remember that?

2    A.   No.  I don't remember any bank calling me

3    about anything subsequent to that.

4    Q.   I asked before about TD Capital.  Did you

5    ever agree to invest in TD Capital, that you          12:50:03PM

6    remember?

7    A.   No.

8    Q.   Did you ever agree to invest money with

9    TD Capital?

10   A.   No.                                               12:50:11PM

11   Q.   Sitting here today, do you have any

12   understanding of what TD Capital is?

13   A.   TD Capital, according to Jim Dawood, was one

14   of his entities that he had used many times.  He

15   actually showed me his cellphone and he said, "See    12:50:29PM

16   these?"  Took his cellphone and he scrolled through.

17   I said, "Well, how many accounts are there?"  He

18   said, "About a hundred."  I said, "A hundred?"  He

19   said, "Yeah.  I've helped a hundred people with their

20   estates."  I said, "Oh, really?"  And then he went to 12:50:47PM

21   another screen, and he pulled it up and he said,

22   "This is -- this is the sum total of my assets:

23   548 million, with an 'M.'  $548 million."

24   Q.   He told you he had $548 million personally?

25   A.   That was the exact amount, and he always         12:51:10PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1  drove up in a Rolls-Royce or a Bentley, Mercedes, or
2  a Land Rover.  Fact, I have a picture in the phone of
3  seven cars that he presumed to own that were from his
4  stable of vehicles.
5     **Q.   Did you go to his house?  Is that where you**    12:51:33PM
6  **saw them?**
7     A.   I never been to his house.
8     **Q.   Okay.  Where did you see the picture of the**
9  **seven cars?**
10    A.   He handed me his phone.    12:51:41PM
11    **Q.   I see.**
12    A.   It was just on the phone.  But I understand
13  he lives in Burbank, California.
14    **Q.   How about Globe Design Build?  Sitting here**
15  **today, do you know what that company is?**    12:51:53PM
16    A.   Just what he mentioned it was.  And it was a
17  investment company that he owned.
18    **Q.   And did you ever agree to transfer money**
19  **into Globe Design Build?**
20    A.   No, I never did.    12:52:09PM
21    **Q.   Did you ever agree to invest in**
22  **Globe Design Build?**
23    A.   No.  None of them.  None of the alleged
24  investments were mentioned that you mentioned, the
25  other two, never never never.  Plus Global.  Never.    12:52:20PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1      Q.   Have you ever heard of the
2   Elliott Institute?
3      A.   No.
4      Q.   And did you ever agree to invest money into
5   the Elliott Institute?                                    12:52:33PM
6      A.   I have never heard that name --
7      Q.   Okay.
8      A.   -- before.
9      Q.   Are you familiar with Colony Capital?
10     A.   No, I am not.                                     12:52:41PM
11     Q.   Did you ever agree to invest money into
12   Colony Capital?
13     A.   Like I said, I have never heard that name.
14     Q.   How about Medline Management Corporation?
15     A.   What was that?                                    12:52:55PM
16     Q.   Medline M-E-D-L-I-N-E?
17     A.   I think I've heard that name once.  But no
18   regard as to what it was other than one of his owned
19   entities that he had invested in and owned.
20     Q.   And did you ever authorize Mr. Dawood to          12:53:11PM
21   transfer money into Medline?
22     A.   No.  None.  Never.
23     Q.   Did you and Mr. Dawood ever talk about the
24   idea of doing any investments with that money?
25     A.   No.  No.                                          12:53:25PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1      Q.   Do you know who a Christine --

2      A.   Donations.  Donations, but not investments.

3      Q.   Charitable donations?

4      A.   Yeah.  One was an alleged church religious

5  fund that I believe was in Anaheim.  And he said we     12:53:38PM

6  can name this the Jack J. Battaglia Charitable Fund.

7  I said, "You can?"  I said that would be great, and I

8  kind of choked up on that one.  That was a unique

9  approach.

10     Q.   Did that ever happen to your knowledge?     12:54:01PM

11     A.   To the best of my knowledge, that was the

12  end of the conversation.

13     Q.   Okay.  Do you know Christine Armani

14  A-R-M-A-N-I?

15     A.   I met her once.     12:54:12PM

16     Q.   Who is she?

17     A.   His -- Jim Dawood's wife.  She came to my

18  home.

19     Q.   And why did she come to your home?

20     A.   He brought her in, showed her around my home     12:54:23PM

21  and yard.  They ran in the backyard and kind of

22  looked around.  And that was it.

23     Q.   Did you ever agree to transfer money to her?

24     A.   No.  Never.

25     Q.   Did -- these questions are going to feel     12:54:40PM

1    repetitive.  Did you ever agree to invest in the

2    purchase of any property in La Crescenta?

3         A.   No.

4         Q.   Did you ever agree to invest in the purchase

5    of any property in Brea?                                    12:54:52PM

6         A.   Never.

7         Q.   Did you ever agree to invest in the purchase

8    of a property in Fontana?

9         A.   No.

10        Q.   Did you ever discuss with Mr. Dawood            12:55:02PM

11   investing any of your money in any property anywhere?

12        A.   I subsequently found out that my home was

13   placed in his control.  And I was shocked.  And I did

14   call and I had a conversation with him.  And I said

15   what are you doing with my residence, my home, and       12:55:27PM

16   your portfolio of assets.  And he said, "That's for

17   your protection."  Everything was always for my

18   protection.  He was here to help me.  He was going

19   forward to do the right things for me.

20        Q.   Did you ever --                                 12:55:47PM

21        A.   Never came to any material gain for me ever.

22   Never.

23        Q.   Did you ever discuss with him investing in

24   any other properties?

25        A.   No.                                             12:55:58PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1    Q.    Okay.  Do you know what Rodeo Smoke Shop is?

2    A.    I have no idea.

3    Q.    Okay.  And did you ever agree that any of

4    the money in that account could be used to pay off

5    Mr. Dawood's personal credit card?                    12:56:11PM

6    A.    Smoke shop?

7    Q.    Smoke shop was the last question.

8    A.    Is that what you were referring to?  And

9    you're referring to what now?

10   Q.    So you don't know what Rodeo Smoke Shop is?     12:56:22PM

11   A.    No, I do not.

12   Q.    Separately, did you ever agree that the

13   money in that trust account could be used to pay off

14   Mr. Dawood's personal credit card?

15   A.    No.                                             12:56:34PM

16   Q.    Is it your understanding that the --

17   A.    Can I have another sip -- sip of water.

18   Q.    Do you want to take a break, Tom?

19   A.    No.  Unless you do.

20   Q.    No.  No.  I'm good.                             12:57:06PM

21        MR. SHERMAN:  Just for a moment.  What's

22   your birth date.

23        THE WITNESS:  9-29-41 September.  I just had

24   my birthday from 81 to 82.

25        MR. SHERMAN:  So I'm -- you're just now 82.      12:57:23PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1          THE WITNESS:  Brand-new 82.  September.
2    September 29, 1941, was my date of birth.
3          MR. SHERMAN:  I'm a month older than you.
4          THE WITNESS:  Well, congratulations.  You
5    don't look it.  Look at all that hair.  You look          12:57:38PM
6    good.
7          MR. SHERMAN:  Thank you.
8          THE WITNESS:  Yeah.  You're not overweight.
9    You look great.
10          MS. RABBANI:  You look good, too, Tom.          12:57:46PM
11          THE WITNESS:  Okay.  Thank you.
12   BY MS. RABBANI:
13       **Q.  So is it your understanding that the**
14   **Aquamarina property ultimately was sold to some third**
15   **property?**          12:57:58PM
16       A.   Yes.  It was sold through my friend,
17   Frank Martinez, brokerage firm.  And Jimmy objected
18   to that.  He said, "You don't have to have another
19   real estate or brokerage firm.  My wife has a real
20   estate brokerage firm.  We can sell it through that."          12:58:14PM
21   And I said, "No.  I don't want it that way.  I want
22   it to go through Frank Martinez who's been a friend
23   of our friends' families that my brother had sold
24   property through and bought property through several
25   times prior to that.          12:58:32PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1    Q.   After that property was sold, did you
2    ever --
3    A.   Excuse me.  Prior to this.
4    Q.   Okay.
5    A.   Prior to this.                              12:58:39PM
6    Q.   Prior to this.
7    A.   Yeah.
8    Q.   Okay.  After that property was sold, did you
9    ever get any proceeds from the sale of the property?
10   A.   Absolutely none.  Not a penny.             12:58:50PM
11   Q.   Did it go into that Bank of America trust
12   account?
13   A.   I honestly don't know where it went, but I
14   asked him about it.  I asked Jim about it, and he
15   said, "Oh we'll get that to you."  Never happened.   12:59:03PM
16   It never happened.  Not a penny.  And it was a
17   substantial amount.
18   Q.   Did you ever get the Hawaii properties
19   transferred back to you?
20   A.   Never.  No.                                12:59:16PM
21   Q.   And so as far as you understand you have no
22   ownership interest in those Hawaii properties right
23   now?
24   A.   No ownership in the money, in the
25   properties, in these home, any other assets -- gone,   12:59:29PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1   as if they've vanished in air and just totally gone.

2   I have no idea.

3        Upon asking him to let me know what -- where

4   the funds are and all, he said, "Oh it'll be come to

5   you.  It's in route.  It's in route."  Not a penny of        12:59:58PM

6   it ever was or ever has been given back of my

7   brother's estate, my brother who worked all of his

8   life very very hard, for every penny he earned.

9        Like I say, he spoke seven languages

10  fluently.  He's a concert pianist.  He's a brilliant        01:00:20PM

11  guy, but he made some good sound investments and

12  properties that got him to where he was, to be able

13  to gain these other properties that I mentioned in

14  Hawaii and to gain the funding where he was when he

15  passed away.                                                01:00:45PM

16       Q.   Have you ever -- do you know what a remotely

17  created check is?

18       A.   A what?

19       Q.   A remotely created check?  Sometimes it's

20  called an RCC.                                              01:00:59PM

21       A.   I've never heard of that.

22       Q.   Did you ever authorize an automatic check to

23  be sent out of that trust account every month?

24       A.   I don't know to which you're referring to.

25       Q.   So I'm trying to think of the best way to        01:01:14PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1   explain this.  Did you ever agree that the trust
2   account would send an automatic check every month to
3   Medline Management?
4       A.   No, I never agreed to it.
5       Q.   Were you aware that the trust account was          01:01:29PM
6   sending automatic checks every month to MMC?
7       A.   No.  No.  His personal transactions were
8   kept solely to his knowledge, not mine.  You know, I
9   vaguely heard of the name of these entities and, like
10  I say, I can't account for a penny of their              01:01:50PM
11  acquisition, disposal, any movement of them or
12  anything because it was just a vague referral to what
13  they were.
14      Q.   Did you ever agree to pay rent for the
15  Aquamarina property?                                     01:02:12PM
16      A.   No.  Oh no.
17      Q.   Okay.  Do you know the name Walter Lima
18  L-I-M-A?
19      A.   No, I do not.
20      Q.   Did you ever agree to lend money to             01:02:30PM
21  Walter Lima?
22      A.   I don't know that name.
23      Q.   Okay.  How about Fares F-A-R-E-S Abbasi
24  A-B-B-A-S-I?
25      A.   I don't know that name either.                  01:02:42PM

1    Q.    Did you ever agree to lend money to

2  Fares Abbasi?

3    A.    I never heard those names.

4    Q.    You mentioned before that at some point

5  Bank of America started a fraud investigation.  When        01:03:08PM

6  that started, do you remember about how much money

7  was left in the trust account?

8    A.    It was a sizable amount, and I want to say

9  in excess of a million.

10   Q.    Do you remember?                                    01:03:24PM

11   A.    Probably a million and half.

12   Q.    That's how much it started with?

13   A.    That's what it started with.

14   Q.    Do you remember how much was left when

15  Bank of America started that fraud investigation?          01:03:32PM

16   A.    Zero.  I heard that -- that's what alerted

17  me.  They came to me that it had been zeroed out.

18  There wasn't a penny in it and I was shocked.  I

19  could not believe that.

20        I said, "What?"  I got to Jim Dawood, and he         01:03:49PM

21  said, "Oh, we've transferred that into my holding

22  companies to protect you from --" I said, "Protect me

23  from what?"  He said, "To protect you."  I said, "But

24  from what?  What are you talking about?  We haven't

25  done anything wrong here, have we?"  And he said,          01:04:13PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1    "Oh, no."

2         But he said I have to put these into holding

3    companies for a short period of time.  He said

4    probably 30 to 60 days maximum.  I said, "This is

5    news to me."  I said, "I didn't agree to this."          01:04:31PM

6    **Q.   Did you ever get any of that money back?**

7    A.   Not a penny.

8    **Q.   Okay.  Did you ever get a call from**

9    **Chase Bank telling you that mortgage payments on the**

10   **Aquamarina property were late?**                        01:04:46PM

11   A.   Yes, I did.

12   **Q.   Was it your understanding that Mr. Dawood**

13   **had just not been making those mortgage payments?**

14   A.   Yeah.  And I'd call him and I'd tell him not

15   only on that but, you know, on the taxes and other        01:05:00PM

16   entities that payments were due.  So I would call and

17   be the intermediary to refer it to him to pay these

18   things.  And he said he would.  And subsequently, to

19   the best of my knowledge, they were paid, but they

20   were late and they incurred some late fees as well.       01:05:22PM

21   **Q.   During this time were you getting paper**

22   **statements from Bank of America to your house?**

23   A.   No.  None.

24   **Q.   Nothing came in the mail?**

25   A.   Nothing came in the mail ever.                       01:05:35PM

```
 1       Q.   Did you ever -- after this fraud
 2   investigation started, did you go to the bank?
 3       A.   I did go to the bank.
 4       Q.   Okay.  And when you went there, did you
 5   change the online login from the account?  Do you        01:05:49PM
 6   remember?
 7       A.   No.
 8       Q.   Okay.
 9       A.   Well, there was nothing there to change.  It
10   had been siphoned off by, I assume, Mr. Dawood.          01:06:02PM
11       Q.   Okay.  We're going to take a short break,
12   Tom, and then come back.
13            MS. RABBANI:  Can we go off the record.
14            THE VIDEOGRAPHER:  We're off the record.
15   The time is 1:06 P.M., Pacific Time.                     01:06:25PM
16            (Whereupon a recess was taken.)
17            THE VIDEOGRAPHER:  We're back on the record.
18   The time is 1:21 P.M., Pacific Time.
19   BY MS. RABBANI:
20       Q.   When you met Mr. Dawood, do you remember        01:21:30PM
21   anything else he told you about his credentials?
22       A.   Well, he told me that he was a medical
23   doctor.  And that his brother was a medical doctor.
24   Told me he was an attorney at one point and a
25   financial business consultant.                           01:21:46PM
```

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1      Q.   Mr. Dawood told you that he himself was a
2   doctor, lawyer, and business consultant?
3      A.   Yes.
4      Q.   Okay.  And he told you that his brother was
5   a doctor or lawyer?                                    01:21:57PM
6      A.   Lawyer.
7      Q.   Okay.  Did you ever meet Mr. Dawood's
8   brother?
9      A.   Yes.
10     Q.   What was his name?  Do you remember?          01:22:04PM
11     A.   Nathan.
12     Q.   And why did you meet Nathan?
13     A.   Basically to go there to rewrite the will
14   and trust of my brother.
15     Q.   And did you have Mr. Nathan Dawood rewrite    01:22:24PM
16   the will and trust?
17     A.   Yes.
18     Q.   Do you remember what he did?
19     A.   He made a few changes and charged me
20   something like 8- or $9,000 for it.                   01:22:37PM
21     Q.   Did you pay him for that?
22     A.   It came out of the Jim Dawood fund and then
23   also I checked who Mr. Dawood for his contribution.
24   That was about $7,500.
25     Q.   Did you have Mr. Nathan Dawood work on your   01:23:03PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1    own personal will and trust?

2        A.    No.

3        Q.    Just your brother's?

4        A.    Correct.

5        Q.    Okay.  I'm going to ask you about a series          01:23:12PM

6    of transactions.  It's going to be a little boring.

7            On September 9th of 2019, did you authorize

8    a wire transfer from that trust account to another

9    Bank of America account in the amount of $731

10   thousand 989 -- sorry -- $731,989.65?                          01:23:39PM

11       A.    No.  No knowledge of that at all.

12       Q.    On September 17, 2019, did you authorize a

13   wire transfer in the amount of $654,063.80 out of the

14   trust account to a separate Bank of America account?

15       A.    No.  Never.                                          01:24:12PM

16       Q.    Did you authorize on or about November 19,

17   2019, a $10,000 online bank transfer from the trust

18   account to a separate Bank of America account?

19       A.    No.  Never.

20       Q.    On or about November 26, 2019, did you               01:24:29PM

21   authorize a wire transfer in the amount of $25,000

22   from the trust account to an account for the

23   Elliott Institute?

24       A.    I'm wondering if that is the institute that

25   he agreed to have named -- renamed the Jack J.                 01:24:53PM

1  Battaglia fund.  I don't know if that is a fact.  I'm

2  assuming, and I shouldn't assume, but I assume it

3  might be.  It might be.  I don't know.

4  **Q.   So if -- you did potentially authorize some**

5  **money to be transferred for charitable fund in your**          01:25:16PM

6  **brother's name.  Is that what you're saying?**

7  A.   Not specifically.

8  **Q.   So on or about November 26th, did you**

9  **authorize a $25,000 wire transfer out of the trust**

10 **account for any purpose other than charitable?**               01:25:36PM

11 A.   No.  Not -- no.  No.

12 **Q.   Okay.**

13 A.   That's just a brief assumption of a vague

14 recollection that I can't substantiate, but I assume.

15 I'm making an assumption here.  Make that very clear.          01:25:54PM

16 That's an assumption.  It is not fact.  It's just

17 kind of a thought that it could be.

18 **Q.   Okay.**

19 A.   I don't know for sure.

20 **Q.   But you didn't authorize a transfer for any**          01:26:07PM

21 **non-charitable purpose?**

22 A.   No, I didn't.

23 **Q.   Okay.  On or about December 6, 2019, did you**

24 **authorize an online bank transfer of $10,000 from the**

25 **trust account to a separate Bank of America account?**        01:26:22PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

```
 1     A.   No.
 2     Q.   Okay.  On or about December 23rd of 2019,
 3  did you authorize an online bank transfer of $3,000
 4  from the trust account to an account belonging to
 5  Christine Armani?                                         01:26:46PM
 6     A.   No.
 7     Q.   And on or about August 24th of 2019, did you
 8  authorize anyone to access the trust account to
 9  create a check -- a draft check to Medline
10  Management?                                               01:27:08PM
11     A.   No.
12     Q.   Okay.  Okay.  Those are all my questions for
13  right now, Mr. Battaglia.  We have some time
14  remaining of our 90 minutes which we'll save to come
15  back after Mr. Sherman does his cross-examination.        01:27:22PM
16     A.   Okay.  Thank you.
17          MS. RABBANI:  If we can go off the record
18  for a minute.
19          THE VIDEOGRAPHER:  We're off the record.
20  The time is 1:27 P.M., Pacific Time.                      01:27:54PM
21          (Whereupon a recess was taken.)
22          THE VIDEOGRAPHER:  We are on the record.
23  The time is 1:44 P.M., Pacific Time.
24  ///
25  ///                                                       01:44:27PM
```

```
 1                        EXAMINATION
 2    BY MR. SHERMAN:
 3         Q.   Good afternoon, Mr. Battaglia.
 4         A.   Good afternoon, sir.
 5         Q.   My name is Victor Sherman, and I'm the        01:44:33PM
 6    attorney for Mr. Dawood or "Dah-wood."
 7         A.   Yes, sir.
 8         Q.   I'm going to ask you some questions today.
 9    You feeling okay?
10         A.   I'm feeling fine.                             01:44:43PM
11         Q.   And this morning before we started, you told
12    the prosecutor that you're doing well, you're
13    recovering from your heart attack and your stroke,
14    you feel some loss of mobility.  But otherwise you
15    feel in pretty good condition?                         01:44:58PM
16         A.   Yeah.  They were minor.
17         Q.   Minor.  I'm glad to hear that.
18         A.   They were minor occurrences.
19         Q.   Do you know how much longer you are going to
20    be in the hospital?                                    01:45:08PM
21         A.   I have no idea.
22         Q.   Have they told you that you are going to be
23    at some point released from the hospital?
24         A.   Yes.
25         Q.   Did they give you any indication when?       01:45:16PM
```

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

```
 1        A.   No.
 2        Q.   Did they tell you why they were keeping you
 3   in the hospital now rather than just releasing you?
 4        A.   Yes.
 5        Q.   Because?                                        01:45:24PM
 6        A.   Because of immobility.  Not being able to
 7   perambulate and walk like you do and everyone else.
 8   I need to build up the musculature.
 9        Q.   So it really has nothing to do with your
10   heart?                                                   01:45:44PM
11        A.   No, I don't believe so.
12        Q.   Or any other disease you might have?
13        A.   I don't believe so.
14        Q.   All to do with your mobility?
15        A.   Right.                                         01:45:50PM
16        Q.   So once you have either gained more strength
17   in your mobility or other arrangements are made or
18   somebody can assist you in your mobility, you expect
19   to be released?
20        A.   I do.                                          01:46:02PM
21        Q.   So you're not in hospice?
22        A.   That's correct.
23        Q.   And hospice would mean that there's some
24   type of thought that you might die within the next
25   six months to a year?                                   01:46:12PM
```

```
 1       A.    I don't anticipate that.
 2       Q.    So you feel good?
 3       A.    Don't wish it.
 4       Q.    Of course not?
 5       A.    Of course not.                              01:46:20PM
 6       Q.    So there's a trial in this case set for next
 7   year, February or March.  But in your present
 8   condition you've -- other than your mobility -- you
 9   feel that you are going to be capable of being a
10   witness?                                              01:46:32PM
11       A.    I do.
12       Q.    Would you give me a little bit about your
13   educational background?
14       A.    Well, basically graduated in 1959,
15   John Muir High School, Pasadena, California; '61,     01:46:45PM
16   Pasadena City College with an AA degree -- with a BA
17   degree, excuse me, in business.
18       Q.    You had a business degree?
19       A.    Business degree.
20       Q.    From what school?                           01:47:04PM
21       A.    PCC, Pasadena City College.
22       Q.    So that's a two-year school?
23       A.    That's a advanced school past high school.
24       Q.    Then what?
25       A.    Then went on to -- I was at the             01:47:16PM
```

```
 1  Jet Propulsion Laboratory and Caltech, and I was also
 2  pursuing advanced education toward a master's degree
 3  and eventually of a Ph.D. degree.
 4       Q.   Did you ever get your master's or Ph.D.?
 5       A.   I did not.                                       01:47:40PM
 6       Q.   Did you study for a master's?
 7       A.   Yes, I did.
 8       Q.   Eventually you got a bachelor's degree
 9  however?
10       A.   Yes.                                            01:47:47PM
11       Q.   From where?
12       A.   From California State University,
13  Los Angeles.
14       Q.   What year do you remember?  Approximately.
15       A.   I want to say 1965 or '66, and the reason       01:48:00PM
16  for that was that I was working full time at the
17  Jet Propulsion Laboratory.
18       Q.   What were you doing at JPL?
19       A.   I was -- held several positions and mainly
20  in employment.  I was one of their employment reps,       01:48:28PM
21  worked up to employment manager and supervisor.
22       Q.   What were your duties as an employment rep?
23       A.   Basically to hire from ground level to
24  highest academic levels, even CEOs of companies.
25       Q.   So that was a critical position at JPL?         01:48:54PM
```

```
 1        A.    I believe it was.
 2        Q.    How long did you work for JPL?
 3        A.    About 13 years.
 4        Q.    And during that period of time were you also
 5   pursuing academic advancement?                            01:49:07PM
 6        A.    Yes.  At UCLA, and also I was working at
 7   Caltech.
 8        Q.    What were you doing at Caltech?
 9        A.    Employment for them.
10        Q.    Same type of job as JPL?                        01:49:21PM
11        A.    Yes.  Employment.
12        Q.    So you were working both jobs at the same
13   time?
14        A.    Well, not really.  They would phase me in,
15   phase me out, phase me back in.  They requested my        01:49:29PM
16   assistance in hiring at whatever specific levels.
17        Q.    And as your duties for hiring people at both
18   JPL and --
19        A.    Caltech.
20        Q.    -- Caltech.  I mean, these are obviously        01:49:50PM
21   well-known, worldwide, recognized institutions;
22   correct?
23        A.    Correct.
24        Q.    And you're hiring people that had advanced
25   degrees?                                                  01:50:01PM
```

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

```
 1        A.   Yes.
 2        Q.   You had to go into their background, I
 3   assume, in making determinations as to whether they
 4   would be an acceptable --
 5        A.   Yes, I did.                                    01:50:06PM
 6        Q.   The reporter had told you before during the
 7   break that you had to let me finish my question
 8   before you answered.
 9        A.   Oh, okay.  I'm sorry.
10        Q.   It's all right.  Everybody makes that         01:50:15PM
11   mistake.  And the reason for that is it's very
12   difficult for him to put down two conversations at
13   the same time.
14        A.   I understand.
15        Q.   So let me finish my question.  Then you'll    01:50:25PM
16   answer.  I'll wait.  Then I'll ask another question.
17        A.   Perfect.
18        Q.   So you had a period of time for both JPL and
19   Caltech, about a 13-year period?
20        A.   More than that, actually.                     01:50:41PM
21        Q.   And again you were interviewing orally
22   people that were applying for jobs at both
23   institutions?
24        A.   That's correct.
25        Q.   Did you also review their resumes?            01:50:53PM
```

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

```
 1      A.    Absolutely.
 2      Q.    So that required you to read documentation?
 3      A.    That's correct.
 4      Q.    And what kind of documentation would you
 5   read?                                                      01:51:02PM
 6      A.    Their resumes, their history of their
 7   backgrounds, their -- their knowledge, their
 8   educational backgrounds, social backgrounds.
 9   Virtually everything.
10      Q.    Would you also look at their transcripts     01:51:22PM
11   from school?
12      A.    Absolutely.
13      Q.    And based upon reading all of this
14   documentation, then you would ask questions?
15      A.    That's correct.                               01:51:31PM
16      Q.    Would you prepare reports for your
17   supervisors?
18      A.    Yes.
19      Q.    Did you have more than one supervisor?
20      A.    I had many depending upon the department     01:51:38PM
21   that I was hiring for.
22      Q.    Would that require you to prepare a lot of
23   documentation as to your -- let me finish -- that
24   require you to prepare a lot of reports that would go
25   up the chain of command, so to speak, so that people    01:51:54PM
```

1  higher than you can make decisions about employment?

2     A.   Yeah.  But when you say, "a lot of reports,"

3  it was pretty succinct, pretty direct, and minimal

4  documentation.  Didn't require an awful lot.

5     Q.   Okay.  But you would have to put together  01:52:12PM

6  your impression of the person?

7     A.   That's correct.

8     Q.   Based upon their oral interview and looking

9  at their records?

10     A.   That's correct.  01:52:22PM

11     Q.   And then you would try to condense -- let me

12  finish -- then you would likely condense your

13  impression into a report that would go to your

14  superiors?

15     A.   That's right.  I was trying to prepare  01:52:33PM

16  groups of people who could work together socially,

17  physically, mentally, every other way.  I built teams

18  of people.  And chemistry, physics, mathematics,

19  English -- many different facets that required a team

20  to be formed and formulated.  01:53:07PM

21     Q.   Would you also work with other individuals

22  at both of these institutions to assist you in making

23  determinations about employees?

24     A.   Yes.

25     Q.   So you were a team player?  01:53:17PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

```
 1      A.   I was a team player.
 2      Q.   And when did your employment stop with both
 3  of these institutions approximately?
 4      A.   Difficult to put a year on it.
 5      Q.   I don't need anything specific.  Just give        01:53:40PM
 6  me a general idea.
 7      A.   I don't have -- I don't have a date for you.
 8      Q.   All right.  When's the last time you had
 9  employment?
10      A.   Myself?                                           01:53:59PM
11      Q.   Yes.
12      A.   Basically I was employed at IT,
13  International Technology Corporation in Pasadena.  We
14  did environmental cleanups:  Air, oil, soil, water,
15  asbestos, and nuclear cleanups.  Large cleanups          01:54:22PM
16  around the world.  You know, like the Port of Valdez,
17  the -- just the largest ones.  You've heard of
18  Fluor Corporation.  You've heard of Bechtel.  Well,
19  IT Corporation was the third largest environmental
20  management company in the world.  In the world.          01:54:48PM
21      Q.   How long did you work for that company?
22      A.   For IT?
23      Q.   Yes.
24      A.   I want to say about 12, 13 years.
25      Q.   Okay.  Do you know when you retired?             01:55:02PM
```

```
 1      A.    1961.
 2      Q.    No.  Retired from working?
 3      A.    I was 61 years old.
 4      Q.    So you're 61 years old?
 5      A.    I'm sorry.  61 years old.              01:55:19PM
 6      Q.    So you retired about 20 years ago?
 7      A.    Exactly.
 8      Q.    And in the last 20 years, have you done any
 9   outside consulting or work for any company?
10      A.    Mainly telephone interviewing and hiring for   01:55:30PM
11   the Navy of the United States and several other
12   entities as well.
13      Q.    I take it, during your many years of
14   employment, you had to read contracts?
15      A.    Absolutely.                            01:55:46PM
16      Q.    And in reading the contracts, presumably
17   your expertise allowed you to understand what the
18   contract said?
19      A.    I would hope so.
20      Q.    So would you consider yourself an expert in   01:55:56PM
21   reading contracts?
22      A.    Well, I was promoted to director level --
23   whatever you wish to put on that as to the level of
24   expertise -- and I was nominated a couple of times
25   for vice president as well.                    01:56:15PM
```

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1    Q.   What companies were you nominated for vice

2    president?

3    A.   IT Corporation.  My own firm that I

4    established.

5    Q.   Which was what?                                01:56:26PM

6    A.   Thomas Michael, TMB --

7    Q.   I'm sorry?

8    A.   -- TMB Associates.  That was my company.

9    Q.   And what was that company established for?

10   A.   Largely management firms around the country.   01:56:38PM

11   Q.   So would you consider yourself pretty

12   sophisticated in the business world?

13   A.   I don't know what "pretty sophisticated"

14   interprets to, but certainly a lot of years devoted

15   to it.  And to some pretty prominent companies.  I   01:57:00PM

16   also worked for TRW.  Thompson Ramo Wooldridge.

17   You've heard of them as well.

18   Q.   Yes.

19   A.   In Redondo Beach.

20   Q.   What'd you do for them?                         01:57:15PM

21   A.   Employment.  I was taken from one firm to

22   another.  Continually promoted to a higher level in

23   all of these entities.

24   Q.   What's the highest title you ever obtained

25   for any of these companies?                          01:57:33PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1    A.    Director.
2    **Q.    And what company was that?**
3    A.    That would be IT Corporation.
4    **Q.    And in your employment over the years, I'm**
5    **assuming that you worked for probably 40 years?**    01:57:44PM
6    A.    I want to say more than that.
7    **Q.    More than 40 years?**
8    A.    About 45.
9    **Q.    Based upon your background, which seems**
10   **substantial, you must have dealt with some very other**    01:57:57PM
11   **sophisticated individuals, lawyers, accountants?**
12   A.    Yes.
13   **Q.    You would deal with lawyers on a regular**
14   **basis?**
15   A.    I hired some lawyers.    01:58:07PM
16   **Q.    And how would you go about hiring lawyers?**
17   A.    Attorneys.  How would I go about it?
18   **Q.    What did you do to investigate their**
19   **backgrounds?**
20   A.    Well, that's just exactly what you do.  You    01:58:17PM
21   investigate their backgrounds and you recruit them
22   from these other companies that are most desirable to
23   your needs at your company, and I was pretty well
24   known doing that.
25   **Q.    So you feel comfortable in dealing with**    01:58:41PM

1    lawyers?

2        A.    I do.

3        Q.    **And in your own life, have you employed**

4    **lawyers here and there?**

5        A.    No.                                              01:58:50PM

6        Q.    **Never?**

7        A.    I can't say never, but I don't recall any.

8        Q.    **Well, for instance, in preparing a will or**

9    **trust documents?**

10       A.    Vaguely.  I don't have a lot of knowledge       01:59:01PM

11   there.

12       Q.    **We're going to get to that later on in the**

13   **deposition, but in essence you feel comfortable**

14   **around well-educated people?**

15       A.    I do.                                            01:59:17PM

16       Q.    **Now, you've indicated that your brother was**

17   **very intelligent?**

18       A.    Extremely.

19       Q.    **And spoke many languages?**

20       A.    Yes, he did.                                     01:59:25PM

21       Q.    **And both of you were very close?**

22       A.    Yes, we were.

23       Q.    **Were you the only siblings?**

24       A.    Yes.

25       Q.    **Before your brother died in 2019, were your**  01:59:31PM

1  parents still alive?

2       A.   No.

3       Q.   When did your parents die approximately?

4       A.   Well, my mother preceded my father, and

5  he -- he died ten years later than my mother.  I'm          01:59:51PM

6  trying to recall those dates.  You may ask me -- I

7  don't know.  I don't recall them.

8       Q.   But it was some years before your brother

9  died?

10      A.   Yes.  Oh yes.                                      02:00:05PM

11      Q.   So after your brother -- after your parents

12  died, you and your brother stayed very close?

13      A.   Yes.

14      Q.   Did you live in the same area?

15      A.   Yes.  We were very close.  About a mile and       02:00:13PM

16  a half apart.

17      Q.   Would you see each other on a daily basis?

18      A.   Almost.

19      Q.   And talk frequently?

20      A.   Frequently.  Probably every day.                  02:00:23PM

21      Q.   And would he tell you what his life was

22  about and would you tell him what your life was

23  about?

24      A.   Absolutely.

25      Q.   And you really didn't have any secrets            02:00:33PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

```
1   between the two of you?
2       A.   Not that I can recall.
3       Q.   So you knew what his life was like?
4       A.   Pretty much.
5       Q.   Was he married?                          02:00:43PM
6       A.   No.
7       Q.   Did he ever marry?
8       A.   No.
9       Q.   Did you?
10      A.   Yes.                                      02:00:49PM
11      Q.   And is your wife still alive?
12      A.   I've lost track.  I was married twice.
13      Q.   Okay.  And when -- let's say in the year of
14  2019, were you married at that time?
15      A.   I believe so.                             02:01:09PM
16      Q.   Did you live with your wife in 2019?
17      A.   No.  I'm sorry.  We were separated at that
18  time.
19      Q.   Did you ever divorce her?
20      A.   Yes.                                      02:01:20PM
21      Q.   Was that after or before your brother died?
22      A.   After.
23      Q.   Your brother was sick for a period of time
24  before he died?
25      A.   Yes.                                      02:01:34PM
```

1   Q.   Do you know what he was sick with?  What his

2   problem was?

3   A.   Heart problems.

4   Q.   Was he in the hospital?

5   A.   Yes.                                              02:01:40PM

6   Q.   For some period of time?

7   A.   Yes.

8   Q.   Was his death expected or unexpected?

9   A.   It was -- well, when you have three invasive

10  procedures from the groin up to your heart to repair    02:01:57PM

11  valves in your heart -- four valve chambers -- and

12  the fourth one got -- got you.  The fourth one, he

13  did not make it.  That was the TAVR.  Okay?  Did not

14  make that procedure.

15  Q.   I take it his death was in the end expected        02:02:18PM

16  or unexpected when he actually died?

17  A.   Unexpected.

18  Q.   So you were hoping that he would recover?

19  A.   Absolutely.

20  Q.   So when he died, I assume it was a great           02:02:33PM

21  shock to you?

22  A.   Extremely great.

23  Q.   And it was unexpected because, number one,

24  you thought he was recovering, and two, you were

25  hoping he would recover and the two of you were very    02:02:46PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1   close?

2       A.   And the doctors reassured me that that

3   fourth procedure was going to be beneficial and that

4   he would survive it.  But he did not.

5       Q.   Did you and your brother ever go to the same        02:03:00PM

6   law firm to prepare trusts?

7       A.   Yes.

8       Q.   And you remember what year that was?

9       A.   Oh, god.  I want to say 1989.

10      Q.   Do you recall both of you going to a lawyer          02:03:15PM

11  in the year 2018?

12      A.   I think that was Chamberlain and Viau,

13  husband and wife attorneys, in Los Angeles.  I

14  believe it was them.

15      Q.   All right.  So you do have a recollection in         02:03:37PM

16  the year 2018 that both of you went and updated or

17  modified your trusts?

18      A.   Yes.

19      Q.   Originally you started a trust or created a

20  trust with some other law firm?                                02:03:52PM

21      A.   Yeah.

22      Q.   And what year was that approximately?

23      A.   That would have been ten years prior --

24  prior to Chamberlain and Viau.

25      Q.   And at the earlier trust, did you and your           02:04:04PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1   brother go to the same lawyers to create the trust?

2       A.   Yes.

3       Q.   So you created the trusts more or less at

4   the same time?

5       A.   Yes.                                          02:04:14PM

6       Q.   And then at 2018 you wanted to update your

7   trust, you and your brother, so the two of you

8   decided to go to the same lawyers?

9       A.   Yeah.

10      Q.   And that's, in fact, what you did?          02:04:22PM

11      A.   I believe so.

12      Q.   And I believe I'm going to show you

13  documents later, but it appears that you and your

14  brother both executed, updated, or modified trust

15  agreement within 60 days of each other.  Do you     02:04:35PM

16  remember that?

17      A.   If you say so.

18      Q.   Well, I'm going to show you documents and

19  you can verify that, but that's what I'm saying.

20      A.   All right.                                   02:04:46PM

21      Q.   And you both went to the same law firm?

22      A.   Yeah.

23      Q.   And both of you had your signeurs (phonetic)

24  notarized by the same notary.  Do you remember that?

25      A.   I don't remember.                            02:04:55PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1      Q.    All right.  We're going to get to that in a
2  few moments.
3           Now, you say that you met Mr. Dawood within
4  a few days after your brother died or within a short
5  period of time, I believe you said?  Maybe a couple          02:05:10PM
6  of weeks?
7      A.    Right.
8      Q.    Your brother died, I think, on July the
9  13th?
10     A.    Of 2019.                                           02:05:18PM
11     Q.    Correct.  Do you remember meeting with
12  Mr. Dawood within a week of your brother's death?
13     A.    I didn't think it was that close.  I thought
14  it was more like two weeks.
15     Q.    All right.  Let's say two weeks.  And the          02:05:31PM
16  purpose of meeting with Mr. Dawood was because he had
17  been referred to by a friend of a friend?
18     A.    That's correct.
19     Q.    And at that time you wanted to deal with
20  your brother's home?                                         02:05:42PM
21     A.    Yeah.
22     Q.    That was the purpose of the meeting, wasn't
23  it?
24     A.    Right.
25     Q.    And you met with Mr. Dawood and some other          02:05:48PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1  **individuals also at the site of your brother's home,**

2  **the Aquamarina property?**

3      A.   That's correct.

4      **Q.   And that was you and maybe at least three**

5  **other people?**    02:06:01PM

6      A.   Yes.

7      **Q.   And the purpose of that meeting was to**

8  **determine the worth of the property?**

9      A.   Not the purpose but -- well, one of the --

10 one of the purposes, but it was mainly to prepare it    02:06:12PM

11 for sale.  That's my recollection.

12     **Q.   Okay.  And the property needed a lot of**

13 **work, didn't it?**

14     A.   No, it didn't.

15     **Q.   Okay.  So you thought it was in fair**    02:06:25PM

16 **condition?**

17     A.   Much better than fair.

18     **Q.   At that time did you have an idea as to the**

19 **approximate worth of the property?**

20     A.   I knew that properties within the block --    02:06:36PM

21 that same block that he lived in -- sold for in

22 excess of a million dollars.

23     **Q.   Okay so you thought your property was worth**

24 **somewhere in that neighborhood?**

25     A.   I thought his property was worth that.    02:06:49PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1       Q.   All right.  Did you have any actual physical
2   appraisal shown to you by anybody?

3       A.   Not at that point.

4       Q.   All right.  So when you met with Mr. Dawood,
5   I believe your testimony was that he would do what          02:07:06PM
6   was necessary to assist you in preparing the property
7   for resale?

8       A.   That's correct.

9       Q.   And included in that was that he would
10  invest money to update the property or do whatever         02:07:24PM
11  was necessary to make it as --

12      A.   Salable.

13      Q.   -- salable as property; correct?

14      A.   That's correct.

15      Q.   And during that -- was that at the initial        02:07:35PM
16  conversation?

17      A.   One of them.

18      Q.   But you had no agreement as to any fee that
19  he would charge for doing that?

20      A.   Well, I assumed he was going to charge me.         02:07:50PM
21  He said, "We'll take care of that later," he said.

22      Q.   I believe you told the prosecutors that he
23  was going to pay some of the bills, invest money in
24  the property, pay the taxes, pay the mortgage.  Was
25  that your understanding?                                    02:08:07PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1      A.   That was my understanding.

2      **Q.   So here's a person that you had met very**

3   **briefly.  He was a stranger; correct?**

4      A.   Right.

5      **Q.   And it was your understanding based upon**          02:08:17PM

6   **your initial conversations that he would put up his**

7   **own money to make the property more salable?**

8      A.   No.

9      **Q.   Okay.  What did you understand?**

10      A.   I understood that some of the funds of my          02:08:29PM

11   brother's savings would be available to make the

12   repairs.  And it only needed a paint job and some

13   flooring and about $600 worth of roofing -- $660

14   worth of roofing; I remember talking to that roofing

15   contractor.                                                 02:08:59PM

16      **Q.   So you were going to provide the funds to**

17   **repair the property?**

18      A.   Through his funds and some of mine as well.

19      **Q.   I'm confused.  When you talked to the**

20   **prosecutor this morning, you indicated that**              02:09:11PM

21   **Mr. Dawood was going to put up the money to repair**

22   **the property.  You're now saying that's not accurate.**

23   **In fact, you were going to put up some of the money?**

24           MR. SHERMAN:  Objection.  I think that

25   misstates the prior testimony.                              02:09:22PM

1    BY MR. SHERMAN:

2        Q.   All right.  Well, just tell me your best

3    recollection.

4        A.   Best recollection -- a partial amount that I

5    would provide.  No -- no specific amount.                    02:09:35PM

6        Q.   So no specific amount was ever --

7        A.   No.  None.

8        Q.   Did you understand that you would cost "X"

9    dollars, for instance, to repair the property?

10       A.   I understood, but then, basically, when I       02:09:49PM

11   talked to Mac Cablan, the individual that I mentioned

12   repaired homes and rebuilt homes brand-new, he said,

13   "This is outlandish.  These charges for these

14   entities to be -- to repair Jack's property are

15   crazy."  He said, "I've maintained this property for     02:10:09PM

16   20 years."  He said, "And there's no -- there's no

17   knowledge of his needing this expensive work that has

18   been claimed."

19       Q.   All right.  So Mr. "Day-wood" or "Dah-wood"

20   did provide you with a figure that he said would        02:10:28PM

21   require the house to go under some kind of renovation

22   for resale.  He did give you a figure.  Is that what

23   you're saying?

24       A.   Well, that came in several different

25   iterations.  Not all at once.                            02:10:43PM

1    Q.   Well, at some point did he tell you it's

2    going to cost "X" dollars to make this house salable?

3    A.   Not really.

4    Q.   Well, you just said there's a million dollar

5    figure.  Where did that come from?                    02:10:55PM

6    A.   That was from my brother's money.

7    Q.   Mike, you said that you talked to somebody

8    and you told him that, presumably, someone told

9    you -- and I assumed you meant Mr. Dawood -- that it

10   would cost a million dollars to make this property --  02:11:09PM

11   A.   That's what he said.

12   Q.   Who is "he"?

13   A.   Jim Dawood.

14   Q.   All right.  So now I'm asking when did

15   Mr. Dawood say it would cost a million dollars --       02:11:20PM

16   A.   I don't know when.

17   Q.   Well, did it occur in one of the first

18   meetings?

19   A.   No.

20   Q.   Did it occur a month later?                        02:11:27PM

21   A.   No.

22   Q.   Well, when did it occur?

23   A.   It occurred at various entities along the

24   way.  For instance, the refrigerator was alleged to

25   be bought for $6,400 and then --                        02:11:41PM

```
 1       Q.   Let's just stop there for a moment, if you
 2   might.
 3            So a new refrigerator was put into the
 4   premises?
 5       A.   Right.                                          02:11:54PM
 6       Q.   And that you were told it was $6,400?
 7       A.   That's correct.
 8       Q.   Where did that money come from?
 9       A.   I have no idea.
10       Q.   Well, did you pay for it?                       02:12:02PM
11       A.   I assume I did.
12       Q.   Well, did you write a check for it?
13       A.   No.
14       Q.   Did you expect Mr. Dawood would use his own
15   money to pay for the refrigerator?                       02:12:13PM
16       A.   No.
17       Q.   So the money had to come from somewhere?
18       A.   Right.
19       Q.   Did you ask at the time that the
20   refrigerator was bought --                               02:12:22PM
21       A.   I did.
22       Q.   And what did he tell you?
23       A.   And he said, "Correction.  It is not
24   $6,400."  He said there was a dent in it.
25       Q.   There was what?                                 02:12:31PM
```

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1     A.   There was a dent in the refrigerator, and he
2  said, "We've got it for something like $1,400."
3     Q.   Okay.  So some figure?
4     A.   Yeah.
5     Q.   Okay.  Did you expect he was putting up his          02:12:42PM
6  own money?
7     A.   No.
8     Q.   So you knew that he was somehow getting the
9  money to pay for the refrigerator; correct?  Were
10 there other appliances --                                     02:12:56PM
11          You have to answer yes or no.
12    A.   Yes.
13    Q.   Okay.  And were there other things that were
14 being bought for the premises?
15    A.   Yeah.                                                 02:13:05PM
16    Q.   For instance, it needed new hardwood floors;
17 correct?
18          You have to answer yes or no.
19    A.   Yes.
20    Q.   And you had to put in new windows, did you            02:13:14PM
21 not?
22    A.   I don't recall the windows.
23    Q.   Well, do you know that walls were being
24 knocked down?
25    A.   Well, not knocked down, but resurfaced.              02:13:26PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1    Q.   All right.  Where did you think that money
2    was coming from?
3    A.   I was unaware.
4    Q.   Well, you knew it was coming from somewhere?
5    A.   I didn't question it.                              02:13:42PM
6    Q.   My only question is --
7    A.   I didn't question him.
8    Q.   My only question is you knew the money was
9    coming from somewhere?
10   A.   But I didn't question him as to where it was    02:13:50PM
11   coming from.
12   Q.   You never asked?
13          THE WITNESS:  Can I have some water.
14          MR. SHERMAN:  I'm sorry.
15          THE WITNESS:  Thank you.                         02:13:58PM
16          MR. SHERMAN:  You're welcome.
17          THE WITNESS:  Thanks.
18   BY MR. SHERMAN:
19   Q.   I'm going to come back to the Aquamarina
20   property in a few minutes, but I want to turn to the   02:14:18PM
21   Hawaii property.
22   A.   Okay.  Two Hawaii properties.
23   Q.   Two Hawaii properties.
24   A.   906 and 1103.
25   Q.   It is your testimony there was never any         02:14:32PM

```
 1   written documentation regarding the Hawaii
 2   properties; is that correct?
 3       A.   That's correct.
 4       Q.   So you never signed any documents?
 5       A.   No.                                          02:14:40PM
 6       Q.   Never saw any documents?
 7       A.   No.
 8       Q.   You never agreed to sell the property?
 9       A.   No.  This was his recommendation.
10       Q.   I understand that, but your testimony is you  02:14:49PM
11   never signed a single document that had anything to
12   do with the Hawaii property?
13       A.   That's correct.
14       Q.   Did you ever hire a lawyer in Hawaii to
15   assist you in selling the property?                   02:15:01PM
16       A.   No.
17       Q.   Do you know if a lawyer in Hawaii ever went
18   to court to get permission to sell the Hawaii
19   property to some entity that -- some LLC?
20       A.   Well, I talked to the lawyer who I knew, you  02:15:16PM
21   know, why that we bought properties from, and he told
22   me that he was putting the properties up for sale.
23       Q.   Okay.  So you did employ a lawyer in Hawaii?
24       A.   I didn't employ him.  He referred himself to
25   me.                                                   02:15:42PM
```

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1    Q.    Whose lawyer was that?

2    A.    I don't know.

3          (Whereupon there was a brief

4          cellphone interruption in the

5          proceedings.)                                    02:15:47PM

6          THE WITNESS:  Hi.  I'm in a meeting.  I'll

7    have to call you back.

8          MR. SHERMAN:  It might be helpful if you

9    turned off the phone.

10         THE WITNESS:  Okay.  I thought I already    02:16:14PM

11   had.

12         MR. SHERMAN:  You need some help?

13         THE WITNESS:  It's not responding.

14         MR. SHERMAN:  Here.

15         You want to turn it off.                     02:16:49PM

16         MS. SPENCER:  Are you comfortable with that?

17   I'll just turn it on silent.

18   BY MR. SHERMAN:

19   Q.    All right.  So is your testimony that you

20   knew the property in Hawaii was being sold or not?  02:17:05PM

21   A.    I was -- I was unaware of that.

22   Q.    Do you know as you sit here today, based

23   upon your knowledge in 2019, that the Hawaii property

24   was sold or not sold?

25   A.    I don't know.  The story changed from this  02:17:26PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1  side to that side, from my side to his side, back and
2  forth, back and forth, no paperwork, no knowledge of
3  any of this.
4      Q.   All right.
5      A.   None.                                                02:17:39PM
6      Q.   Now, there is a lawyer that you -- that
7  somehow discussed with you selling the Hawaii
8  property; correct?
9      A.   No.  I dealt with my associate here,
10  Frank Martinez.  And Mr. Dawood objected to that.  He    02:17:53PM
11  said, "My wife can assist you.  We have a legal firm
12  that we can assist you with."
13      Q.   Isn't that for the sale of the Aquamarina
14  property that you're referring to right now?
15      A.   I'm referring to the Hawaii properties.         02:18:11PM
16      Q.   Okay.  So the idea that the Hawaii property
17  was going to be sold was a discussion between you and
18  Mr. Dawood?
19      A.   No.  This was all done unbeknownst to me,
20  sub rosa.  I was not told of these actions.              02:18:30PM
21      Q.   Okay.  You just said that Mr. Martinez
22  was -- said that "I can sell the property --"
23      A.   Well, this is where it's confusing, because
24  Jimmy told me that it was this one day, that way the
25  next day.                                                02:18:48PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1   Q.   I'm not asking you -- I'm sorry.

2        I'm not asking you about what Mr. Dawood

3   said.  I'm asking about your conversation with

4   Mr. Martinez, your friend?

5   A.   Right.                                        02:18:56PM

6   Q.   Did your friend, Mr. Martinez, tell you that

7   he was capable of selling properties for you?

8   A.   Yes.

9   Q.   Which properties was he referring to?

10  A.   My brother's house and the two properties in  02:19:05PM

11  Hawaii.

12  Q.   All right.  So Mr. Martinez said, "If you

13  want to sell the house in the Aquamarina property and

14  if you want to sell the two properties in Hawaii, I

15  can do it"?                                        02:19:21PM

16  A.   Yes.

17  Q.   So those properties were, in your mind, up

18  for sale?

19  A.   Right.

20  Q.   And you're saying that Mr. Dawood            02:19:26PM

21  specifically said, "I can sell the properties.  Don't

22  use Mr. Martinez"?

23  A.   Yes.

24  Q.   Would you be surprised if there are

25  documents that you signed that say exactly the       02:19:42PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1  opposite?

2      A.   I would be surprised.

3      Q.   And would you be surprised that there are

4  documents in writing signed by you that specifically

5  said that Mr. Dawood, through various LLCs, granted          02:19:54PM

6  you the permission to pick exactly the person that

7  you wanted to sell your properties?  Would that be

8  something surprising to you?

9      A.   Yes, it would.

10     Q.   All right.  So you're saying that          02:20:07PM

11  Mr. Martinez -- by the way, he is not a real estate

12  agent, is he?

13     A.   He's a broker.

14     Q.   He's a broker?

15     A.   In Orange county.          02:20:19PM

16     Q.   So how would he assist you in selling

17  property in Hawaii?

18     A.   Well, he told me he could and he did.

19     Q.   So he sold the properties in Hawaii for you?

20  Is that what you're saying?          02:20:32PM

21          You have to say yes or no.

22     A.   Yes.

23     Q.   And who did he sell the properties to?

24     A.   Well, the home was sold to --

25     Q.   I'm not asking about the house.  I'm asking          02:20:43PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1    the Hawaii property.

2        A.   Oh, the Hawaii property, I don't know.  See,

3    I don't know.

4        Q.   Well, you -- you just said --

5        A.   There's a lot of confusion here as to who      02:20:54PM

6    sold what to whom, because one day it was this way,

7    then the next day it was that way.  One day I owned

8    it.  The next day his firm owned them.

9        Q.   Did Mr. Martinez sell the homes in Hawaii,

10   the condos, for you?                                     02:21:11PM

11       A.   He sold the home.

12       Q.   I asked you about the condos in Hawaii.  Did

13   he sell them?

14       A.   You said the home and condos.

15       Q.   I apologize.  Did he sell the condos for you    02:21:20PM

16   in Hawaii?

17       A.   I don't believe so.

18       Q.   Do you know who sold the condos in Hawaii on

19   your behalf, if they were sold?

20       A.   I don't recall.                                 02:21:45PM

21       Q.   The lawyer that may have assisted in the

22   sale of the properties in Hawaii, do you know the

23   name of that lawyer?

24       A.   He's a real estate broker.

25            MS. RABBANI:  What's the name?  Let me see      02:22:07PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1   the document that shows the name of the lawyer that

2   went to court.

3           (Whereupon an unidentified

4           individual entered the room.)

5           THE VIDEOGRAPHER:  Can we go off the record.          02:22:21PM

6           UNIDENTIFIED SPEAKER:  -- one of you guys

7   wants to shut it off, you just push a button right on

8   that right-side panel, unless I can get over there.

9           THE WITNESS:  You'll have to come over.

10          UNIDENTIFIED SPEAKER:  I have to get there,          02:22:46PM

11  unless you want to push the "off" button for me.

12          THE VIDEOGRAPHER:  We're off the record.

13  The time is 2:22 P.M., Pacific Time.

14          (Whereupon a recess was taken.)

15          THE VIDEOGRAPHER:  We're back on the record.         02:32:46PM

16  The time is 2:32 P.M., Pacific Time.

17  BY MR. SHERMAN:

18      **Q.    Okay.  Mr. Battaglia, other than the two**

19  **condos that were left to you by your brother, have**

20  **you ever been involved in sales of property in Hawaii**          02:33:01PM

21  **in the past?**

22      A.    Yes.

23      **Q.    How many times approximately?**

24      A.    About three times.

25      **Q.    You are aware that to sell property in**          02:33:14PM

1   Hawaii, it is necessary that the seller get

2   permission from the Court to sell the property;

3   correct?

4       A.   No.

5       Q.   You're not aware of that?                        02:33:23PM

6       A.   No.

7       Q.   And when you sold property in Hawaii in the

8   past, did you have to use a lawyer to assist you?

9       A.   It's easier if you do.

10      Q.   And do you know what the lawyer does that      02:33:36PM

11  makes it easier for you to sell the property?

12      A.   Well, I think they list it.  And they

13  inquire a buyer and negotiate the sale.

14      Q.   The lawyer?

15      A.   Yeah.                                             02:33:52PM

16      Q.   Doesn't the lawyer also have to go to court?

17      A.   I would assume he would.

18      Q.   Why do you assume that?

19      A.   Because any transaction involving property

20  requires gaining or losing entity.                        02:34:05PM

21      Q.   Well, specifically in Hawaii, because of the

22  nature of that state, isn't it true to your knowledge

23  that a lawyer is needed to sell property in Hawaii?

24      A.   I assume that's true.

25      Q.   You do that?  You know that?                     02:34:27PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

```
 1      A.    I do assume that's true.
 2      Q.    In this particular case, do you recall
 3   signing documentation to employ a lawyer to assist
 4   you in selling the property in Hawaii?
 5      A.    I don't require -- I don't recall any          02:34:38PM
 6   attorney that I obtained.
 7      Q.    Did Mr. Martinez refer you to a lawyer in
 8   Hawaii?
 9      A.    I don't believe so.
10      Q.    Do you know the name of the lawyer by the     02:34:49PM
11   name of Mary Ellen Loncke L-O-N-C-K-E?
12      A.    No.
13      Q.    Never heard that name?
14      A.    Never heard that name.
15      Q.    Did you ever sign any paperwork authorizing   02:35:01PM
16   her to sell the property in Hawaii on your behalf?
17      A.    No.  Never.
18      Q.    Did you ever sign any purchase agreement
19   with anybody to sell the property in Hawaii?
20      A.    I can't recall.                                02:35:18PM
21      Q.    When you say you can't recall, this is in
22   the year 2019, just within ten days or so of your
23   brother dying.  Don't you remember signing a
24   residential purchase agreement --
25      A.    No, I do not.                                  02:35:34PM
```

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

```
 1        Q.    -- let me finish.
 2              Don't you recall signing documentation to
 3     sell the two condos in Hawaii?
 4        A.    No, I do not.
 5        Q.    So your testimony is you never signed any      02:35:43PM
 6     documentation?
 7        A.    To the best of my knowledge.
 8        Q.    How do you sign your initials?
 9        A.    T-M-B, Thomas Michael Battaglia.
10        Q.    I'm going to show you a document that we're    02:36:08PM
11     going to mark as Exhibit 1.
12              MR. SHERMAN:  Exhibit 1 is a -- what is
13     referred to as an apartment deed for sale of the
14     apartment at 906 Luana Waikiki executed on
15     September 17, 2019.  That will be Exhibit 1.           02:37:29PM
16              (Defendant's Exhibit 1 was marked
17              for identification by the court
18              reporter.)
19     BY MR. SHERMAN:
20        Q.    Do you recall -- let me show you this         02:37:41PM
21     document.  First of all, I'm going to show you page 3
22     of the document.  Do you see that signature?
23        A.    Yeah.
24        Q.    Is that your signature?
25        A.    I think so.                                   02:38:02PM
```

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

```
 1              (Whereupon the reporter interrupts
 2         the proceeding.)
 3         THE REPORTER:  Can you repeat the last
 4    statement you made.
 5    BY MR. SHERMAN:
 6         Q.   I'm going to approach the witness and ask
 7    him if that is his signature.  Just answer yes or no
 8    and then we'll go to the next question.
 9         A.   It's possible, maybe.  I'm not sure.
10         Q.   Okay.  The next page, page 4, is signed by a       02:39:27PM
11    notary, also on September 17, 2019.  You see that?
12         A.   Yes.
13         Q.   And do you see where the notary says that on
14    that day -- and the notary is Mr. Conklin -- a notary
15    public in and for said county and state personally           02:39:49PM
16    appeared Thomas Michael Battaglia, successor trustee
17    of the Jack L. Battaglia Declaration of Trust dated
18    October 29th, 2002 -- by the way, that is the date of
19    the original trust of your brother; correct?
20         A.   What date?                                          02:40:06PM
21         Q.   October 29, 2002.
22         A.   I don't know that to be true.  Also the
23    middle initial is incorrect.  It is not "Jack L."
24         Q.   Jack J.?
25         A.   Oh, "J."  "J" is okay.                              02:40:19PM
```

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1    Q.   All right.  And it says -- the notary says,

2    under penalty of perjury, that you appeared before

3    him on September the 17, 2019, and signed this

4    document.  Do you recall that?

5    A.   No, I do not.                                    02:40:33PM

6    Q.   So you're saying that a notary forged a

7    notary when he said that you personally appeared on

8    that day?

9         MS. RABBANI:  Objection.  That misstates his

10   testimony.                                            02:40:45PM

11   BY MR. SHERMAN:

12   Q.   Well, what is your testimony about this?

13   A.   I am not sure because I never went to Hawaii

14   to sell the properties.

15   Q.   This is not Hawaii.  This is in Orange          02:40:53PM

16   county.

17   A.   Oh, Orange county.

18   Q.   Yes.

19   A.   That would be through Frank Martinez, if it

20   was correct.                                          02:41:01PM

21   Q.   This is a document that says that you went

22   before a notary to -- in Orange county to sell the

23   property at 906 Luana Waka --  Waikiki.  That is the

24   unit, isn't it?

25   A.   You're confusing things.  You're saying         02:41:15PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1  Waikiki, you're saying that house, now you're saying

2  Waikiki.  Which is it?

3      Q.   I'm talking about the condo in Hawaii.

4      A.   Well, if it's the condo in Hawaii, I never

5  went to Hawaii to sell them.                          02:41:29PM

6      Q.   Okay.  I'm not --

7      A.   Physically.

8      Q.   -- I'm not saying you went to Hawaii

9  physically.  I'm saying that you went to a notary in

10  Orange county.                                        02:41:40PM

11     A.   That's a convoluted document.  That's not

12  correct.  It is incorrect, my friend.

13     Q.   Well, what is incorrect about this?

14     A.   Because you keep going back from home in

15  Hawaii -- Honolulu -- home in --                      02:41:55PM

16     Q.   I'm not talking about the home in Hawaii.

17     A.   -- you started out in Orange county.  Then

18  you went to Hawaii.  You've confused the issue.  Now,

19  which is it?  What are we talking about?

20          THE VIDEOGRAPHER:  The camera.              02:42:09PM

21          MS. RABBANI:  Could you step back, Victor.

22  BY MR. SHERMAN:

23     Q.   We are talking about the property in Hawaii,

24  unit 906.  That is one of the units; correct?

25     A.   Okay.                                         02:42:18PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1     Q.   And I'm talking about selling that property

2   in Hawaii in which you had to sign a deed, and rather

3   than physically going to Hawaii to sign the deed, you

4   signed the deed in California.  Do you remember that?

5     A.   No, I do not.                                     02:42:31PM

6     Q.   So you're saying --

7     A.   Hawaii would not permit that.  I guarantee

8   you.  Hawaii law is different than United States law.

9   They have a different twist on it.  You can go to

10  Exhibit 21.  It's going to be the same.  That's not    02:42:49PM

11  true.  That is not true.

12          MR. SHERMAN:  I'm going to mark Exhibit 2,

13  which is a petition and order that was filed in the

14  land court of the state of Hawaii by an attorney by

15  the name of Maryanne Ellen Loncke L-O-N-C-K-E, which    02:43:22PM

16  is entitled "A Petition of Thomas Michael Battaglia,

17  Successor Trustee of the Jack J. Battaglia

18  Declaration of Trust," dated October 29, 2002, for an

19  amendment of land court certificate of title.

20          (Defendant's Exhibit 2 was marked              02:43:36PM

21          for identification by the court

22          reporter and is attached hereto.)

23  BY MR. SHERMAN:

24    Q.   And the document says, "Comes now petition

25  of Thomas Michael Battaglia, successor to that          02:43:42PM

1    trustee --"

2         A.   And I'm supposed to remember 20 years ago?

3         Q.   Just a second.  No.  This is 2019.

4              "-- prays for an amendment of the Land Court

5    to sell the property in Hawaii?"                          02:43:54PM

6         A.   That's worse.

7         Q.   Let me show you this document.

8         A.   I don't know anyone in my area of

9    intelligence who could remember something over

10   20 years.                                                 02:44:22PM

11        Q.   No.  This is not 20 years ago.  This is

12   approximately three years ago -- four years ago.

13        A.   But this is incorrect.

14        Q.   What's incorrect?

15        A.   About my signing it --                          02:44:48PM

16        Q.   Is that your signature?

17        A.   -- in Hawaii.

18        Q.   No one is saying you went to Hawaii to sign.

19   You signed it in California.

20        A.   That could be.  Now that could be.             02:44:57PM

21        Q.   So do you remember that now?

22        A.   No, I don't.

23        Q.   Is that your signature?

24        A.   It may be.  I'm not sure.

25        Q.   It's notarized.                                 02:45:06PM

1      A.   Well, it may be.

2      Q.   So that --

3      A.   I'm not sure.

4      Q.   All right.  So you're not sure whether or

5  not you went to -- in front of a notary and signed          02:45:15PM

6  that document?  Is that your testimony?

7      A.   I'm not sure that that is a correct

8  document.

9      Q.   Well --

10     A.   Period.  That's all I can say.                      02:45:28PM

11     Q.   Do you see where a judge in Hawaii, based

12  upon this petition, signed a document on September

13  the 30, 2019, giving the lawyer permission to sell

14  the property?

15     A.   Where is the judge's signature?  Bess Palma?   02:45:48PM

16     Q.   Yes.

17     A.   There's no signature here.  There's a stamp.

18     Q.   A stamp.

19     A.   But you said signature.

20     Q.   I believe --                                        02:46:01PM

21     A.   Ask Bess if she can recognize her stamp.

22  You know, that's just a plain old property stamp.

23  You can mail it from one to the next --

24     Q.   Okay.

25     A.   -- and do it.                                       02:46:14PM

1    Q.  So you're saying -- it says on September

2  the 30, 2019, Judge Bess K. Palmer or -- excuse me --

3  the register for Hawaii -- judge for the -- of the

4  land court signed this document on September the 30,

5  2019, and there's a stamp.  Do you see that?          02:46:32PM

6    A.  I see what you're saying.

7    Q.  Do you have any doubt that that's authentic?

8    A.  I have no doubt because I have no knowledge

9  of it.  How would I know that?

10   Q.  Well, you employed a lawyer to go to court   02:46:46PM

11  for you.

12   A.  No, I didn't.  Mr. Dawood did.  I did not.

13  He told me that he was taking these properties under

14  his LLCs.  Goldman and those other two that you guys

15  mentioned.  Those were under his wing.  You know, he   02:47:04PM

16  went back and forth, back and forth, so I never knew

17  that that was the case.

18   Q.  All right.  Do you recall actually signing a

19  purchase agreement between you and Mr. Battaglia --

20  between you and Mr. Dawood giving him authority to   02:47:23PM

21  sell the property?

22   A.  No, I don't recall that.  Funny how these

23  things appear and disappear.

24   Q.  Okay.

25      MR. SHERMAN:  I'm going to mark as Exhibit 3   02:47:49PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

```
 1   something called "Hawaii Residential Purchase
 2   Agreement," dated July 23, 2019, between United
 3   Properties, a whiling (phonetic) corporation with a
 4   mailing address of Post Office Box 4192, city of
 5   Glendale, California, who agrees to buy from the Jack    02:48:10PM
 6   J. Battaglia trust a condominium in Hawaii, unit 906.
 7            (Defendant's Exhibit 3 was marked
 8            for identification by the court
 9            reporter and is attached hereto.)
10   BY MR. SHERMAN:                                          02:48:20PM
11       Q.   And I'm going to show you page 8 of that
12   document and ask you if that appears to be your
13   signature?
14       A.   It is definitely not my signature.
15       Q.   That's not your signature?                      02:48:42PM
16       A.   That I can tell it isn't.  I don't sign my
17   signature all scrunched up like that.  I simply
18   don't.  That's a copy.
19       Q.   Do you remember signing a document --
20       A.   That's incorrect.  That's not my signature.     02:48:59PM
21   Guaranteed.
22       Q.   So you never signed -- you never entered in
23   an agreement with Mr. Dawood to sell the property in
24   Hawaii pursuant to this agreement.  Is that your
25   testimony?                                               02:49:11PM
```

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1  A.   That's my testimony.

2  Q.   **And your testimony is that a notary in**

3  **Orange county, which notarized your signature to sell**

4  **that property, is also false?**

5       MS. RABBANI:  Objection.  Misstates his          02:49:23PM

6  testimony.

7  BY MR. SHERMAN:

8  Q.   **Is that your testimony?**

9  A.   I don't know.

10  Q.   **And you're saying that the lawyer that I**      02:49:28PM

11  **mentioned who went to court in Hawaii on your behalf**

12  **as the trustee for the Jack J. Battaglia Trust, that**

13  **also wasn't with your permission?  Is that what**

14  **you're saying?**

15  A.   That's what I'm saying.                          02:49:43PM

16  Q.   **Do you recall getting paid money for selling**

17  **this property?**

18  A.   I do not.

19  Q.   **So there are escrow documents?**

20  A.   I assume that they were still under his --       02:49:59PM

21  Jim's -- ownership.

22  Q.   **So you're saying you never got any money for**

23  **selling this property to Mr. Dawood?**

24  A.   That's correct.

25  Q.   **That's correct?**                              02:50:13PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1    A.   Absolutely hundred percent correct for both

2  properties, 906 and 1103.

3    **Q.   I have a disbursement summary regarding this**

4  **property in which money was sent to the**

5  **Jack J. Battaglia Declaration Trust on -- by a wire**          02:50:31PM

6  **in the sum of a $179,872.18.  Do you recall that?**

7    A.   No, I do not.  And also that is a fraction

8  of its value.  That would be a fraction of its value.

9    **Q.   Do you --**

10       MR. SHERMAN:  Let me have the other                        02:50:58PM

11  agreement.

12       THE WITNESS:  It's a fraction of over a

13  million and a half, isn't it?

14  BY MR. SHERMAN:

15    **Q.   I'm sorry?**                                            02:51:12PM

16    A.   I'm asking the question.  That's a fraction

17  of over a million and a half dollars.

18    **Q.   We're not talking about Aquamarina.  We're**

19  **talking about the condos.**

20    A.   I know what you are talking about.                       02:51:18PM

21    **Q.   What was the square footage of the Hawaii**

22  **property?**

23    A.   13 -- about 13-, 1400.

24    **Q.   Was it less than 500 square feet?**

25    A.   Oh, no.  No.  No.  It's a condominium suite.             02:51:34PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1    Q.   Okay.  My question is, did you ever receive

2  a $179,000 into the trust account from the sale of

3  this property?

4    A.   Never.

5    Q.   So I'm showing you --                              02:51:50PM

6         MR. SHERMAN:  Let's mark it as Exhibit 4.

7         (Defendant's Exhibit 4 was marked

8         for identification by the court

9         reporter and is attached hereto.)

10  BY MR. SHERMAN:                                           02:51:51PM

11    Q.   By the way, there was a loan on this

12  property?

13    A.   May I see it.

14    Q.   I will show it to you in a moment.

15         Do you remember that there was a mortgage on  02:52:06PM

16  this property?

17    A.   What unit are you talking about?

18    Q.   My question is, was there a mortgage on this

19  property?

20    A.   What property?                                    02:52:12PM

21    Q.   The Hawaii condo, which was --

22    A.   Which one?  906 or 1103?

23    Q.   Yes.  906.

24    A.   906, we paid off.  That was already off the

25  books.  He paid that off.  Jack did.  1103 had some  02:52:27PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1   small amount due.

2        Q.   Okay.  I'm going to show you a document

3   that's been marked Exhibit 4, and I'm going to show

4   you -- it's a disbursement summary from the sale of

5   that property.  Do you see that?                          02:52:46PM

6        A.   Yeah.  It says here $179,672.18.

7        Q.   And there was a wire sent to your account in

8   that amount of money for the sale of the property?

9        A.   Where does it attach it to me?

10       Q.   You see where it says, "Sent to the            02:53:11PM

11   Battaglia Trust"?  The disbursement?  I put it in --

12   marked it in yellow.

13       A.   This is not my name on here.  I can't find

14   my name on here.  To what do you refer to?  Where's

15   my name on there?                                        02:53:31PM

16       Q.   "Jack J. Battaglia Declaration of Trust

17   closing proceeds $179,672.18.  Cash to seller."

18       A.   I got it.

19            THE VIDEOGRAPHER:  Your mic fell.  You have

20   to --                                                    02:53:49PM

21            THE WITNESS:  Cash to seller.  But it

22   doesn't have my name on it.  There's no name here.

23   Show me where my name occurs.  Do you see it?

24   BY MR. SHERMAN:

25       Q.   The trust.  That property was held in the      02:54:02PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1    name of the trust, wasn't it?

2        A.   Yeah.  But my name is not on that.

3        Q.   I understand your name was not on it because

4    the property wasn't in your name.  It was in the name

5    of the trust, wasn't it?                                02:54:13PM

6        A.   Who's the Law Offices of Derrick J. Tomilta,

7    L.I.?  My name is not on here.

8        Q.   Who owned the property?  You or your trust?

9        A.   I don't know.  You keep asking me.  It keeps

10   going back and forth from his entities --              02:54:37PM

11       Q.   Forget about --

12       A.   I don't know.  You're asking -- I have no

13   knowledge of any of these transactions.  I don't

14   know.

15       Q.   Okay.                                          02:54:48PM

16       A.   Because I did not participate in them.

17   Never.  Never.  You said my name is on in document.

18       Q.   I didn't say your name is on the document.

19       A.   Yes, you did.  You certainly did.  Do I have

20   witnesses?  Did he say the name was on here?  I've     02:55:04PM

21   been scrutinizing, trying to find it.  It's not

22   there.  My brother's name is on there.

23   Jack J. Battaglia --

24       Q.   Who owned --

25       A.   -- declaration of closing proposals.  Cash     02:55:17PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1   to seller.  179.  That would be a huge huge

2   ridiculous amount of money.

3       Q.   Do you recall receiving that money?

4       A.   No, I do not.

5       Q.   Okay.  The property in Hawaii, that                02:55:37PM

6   particular condo, was in whose name in July of 2019?

7       A.   To my knowledge it should have been in my

8   name.  My name.

9       Q.   In 2019?

10      A.   No.  I'm sorry.  In 2019, would be in my          02:55:54PM

11  brother's name.

12      Q.   Okay.  And at some point did the property in

13  Hawaii transfer from your brother to your name?

14      A.   How do I know?  That he died.

15      Q.   You said that the property was in your name       02:56:07PM

16  at some point:  Yes or no?  The Hawaii property?

17      A.   I assume that --

18      Q.   You assume what?

19      A.   -- that it was.

20      Q.   It was what?                                      02:56:23PM

21      A.   In my name.

22      Q.   Okay.  Why do you assume --

23      A.   It would have because basically my brother

24  agreed to virtually give everything to me on my

25  properties.                                                02:56:36PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1    Q.    Mr. Battaglia, you know that's not true.

2    A.    What do you mean?

3    Q.    You know your brother in 2018 modified his

4    trust so as not to even give you title to his home,

5    Aquamarina property.  Don't you know that?                02:56:49PM

6    A.    That was a joke.

7    Q.    A joke by whom?

8    A.    Some phony-baloney attorney.

9    Q.    It was the same attorney that you went to to

10   do your trust.                                            02:57:05PM

11   A.    Well, you have all the data.

12   Q.    I'm asking your recollection.

13   A.    I don't have any recollection to it.

14   Q.    So you don't know that your brother modified

15   the trust in 2018 in which he removed you as the          02:57:18PM

16   beneficiary of his home in Calle Aquamarina?

17   A.    I'm very vague on this.

18   Q.    Well, that would have been in the same

19   two-week period of your entering into this agreement

20   regarding the sale of the Hawaii property.                02:57:42PM

21   A.    Oh, everything was dumped automatically;

22   right?  Is that what you're saying?

23   Q.    That's not what I'm saying.  What I'm saying

24   is that in 2018 your brother changed his trust so you

25   no longer were the beneficiary of the --                  02:57:57PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1      A.   Let's call him back and ask him that

2  question.  I do not know.

3      Q.   **Well, you have testified on other occasions**

4  **that you were aware that your brother modified his**

5  **trust removing you as the beneficiary of the sale of**        02:58:10PM

6  **his --**

7      A.   No, I never said that.

8      Q.   **You never said that?**

9      A.   I never said that.  You just said that.  I

10  never heard that before.                                       02:58:19PM

11     Q.   **So this is the first time you've heard that**

12  **your brother removed you as the beneficiary of the**

13  **sale of the Aquamarina property?**

14     A.   Yes.

15     Q.   **You testified within the last two weeks in**        02:58:29PM

16  **the civil deposition that in fact you did know that.**

17     A.   Well, I misstated then.

18     Q.   **So now, at this moment, today, is the first**

19  **time you've ever heard that your brother modified his**

20  **trust in 2018 removing you as the beneficiary of the**       02:58:47PM

21  **Aquamarina property?  Is that your testimony?**

22     A.   I learned of that after he passed.

23     Q.   **Well, so you did know that?**

24     A.   Well, I read it, obviously, in the

25  documentation after he passed.                                 02:59:04PM

1    **Q.    When did you learn that?**

2    A.    Subsequent to two thousand -- 2019.

3    **Q.    Well, didn't you know that in 2018 when the**

4    **two of you went to the same lawyer?**

5    A.    No, I did not.                                02:59:32PM

6    **Q.    So your brother kept that a secret from you?**

7    A.    That would be the first secret he's ever

8    kept from me.

9    **Q.    Do you want us to believe that he kept that**

10   **a secret?**                                       02:59:42PM

11   A.    I want you to believe whatever is true, and

12   can you prove that?

13        Is it warm in here?

14        MS. SPENCER:  Are you feeling warm?

15        MS. RABBANI:  Do you want to take a break     03:00:43PM

16   and maybe the nurses can -- I think they can adjust

17   the temp.

18        MR. SHERMAN:  I'm going to mark as

19   Exhibit 5 --

20        MS. SPENCER:  Let's take a break.             03:00:54PM

21        MR. SHERMAN:  Do you want to take a break?

22        THE WITNESS:  Sure.

23        THE VIDEOGRAPHER:  We're off the record.

24   The time is 3:00 o'clock Pacific Time.

25        (Whereupon a recess was taken.)               03:11:52PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

```
 1          THE VIDEOGRAPHER:  We're back on the record.      03:12:21PM
 2     The time is 3:11 P.M., Pacific Time.
 3          MR. SHERMAN:  We're ready?
 4     BY MR. SHERMAN:
 5          Q.   We were talking about the Jack J. Battaglia
 6     Declaration of Trust dated originally October 29,
 7     2002, and it was amended on August 13, 2018.  And the
 8     law firm you mentioned before, that you also used to
 9     do your trust, was the same law firm that your
10     brother used.  Do you remember that testimony?        03:12:43PM
11          A.   I don't remember the testimony, but that
12     sounds correct --
13          Q.   All right.
14          A.   -- as far as the dates.
15          Q.   Okay.  Now, originally, your brother, in the  03:12:52PM
16     2002 trust, left you the Aquamarina property;
17     correct?
18          A.   That's right.
19          Q.   Okay.  And I'm going to have marked as
20     Exhibit 6 the declaration of your -- the trust of      03:13:05PM
21     your brother that was prepared by the law firm
22     Chamberlain and Viau.
23          A.   Chamberlain and Viau.
24          Q.   And Viau.
25          A.   Her name is Viau.                            03:13:15PM
```

```
 1        Q.    V-I-A-U.
 2        A.    Chamberlain and Viau.
 3              (Defendant's Exhibit 6 was marked
 4              for identification by the court
 5              reporter and is attached hereto.)        03:13:20PM
 6  BY MR. SHERMAN:
 7        Q.    And you were aware, when your brother
 8  executed this trust in 2002, that he left you the
 9  house?
10        A.    That's correct.                          03:13:27PM
11        Q.    And during that, did you -- were you also
12  aware that, as part of his trust, that he directed
13  you as the trustee to give certain moneys to other
14  beneficiaries upon his death?
15        A.    Not certain moneys.  One thing was his    03:13:42PM
16  piano.  His Steinway concert grand piano.
17        Q.    Don't you recall in that trust that he told
18  you to give upon his death $50,000 to Nicholas
19  Stratis S-T-R-A-T-I-S?
20        A.    Nicholas Stratis.  I don't recall that.   03:14:04PM
21        Q.    And Kyle Atherton, $25,000?
22        A.    I don't recall that.
23        Q.    And Chris Ruiz, $25,000?
24        A.    Chris who?
25        Q.    Ruiz R-U-I-Z.                             03:14:16PM
```

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

```
 1        A.    I don't know that person.
 2        Q.    And Richard, a friend, $25,000?
 3        A.    Well, he passed away.
 4        Q.    And did you ever see your brother's 2002
 5   trust?                                                    03:14:30PM
 6        A.    I don't think I did.
 7        Q.    So in all the years between 2002 and 2019,
 8   your brother never showed you?
 9        A.    No.
10        Q.    Well, you were the trustee.                    03:14:41PM
11        A.    But he agreed with me that, whoever
12   predecease the other, that we would have a hundred
13   percent of each other's properties given to each
14   other.
15        Q.    Well, you know he changed that in 2018?        03:14:54PM
16        A.    After he died.  After subsequent to his
17   death, yes.
18        Q.    When did you learn that?
19        A.    Well, I don't know.  A few weeks after he
20   passed away.                                             03:15:08PM
21        Q.    How did you learn that?
22        A.    Remember, I was in the hospital and
23   recuperating from a stent in my chest, and then he
24   subsequently -- are you listening?
25        Q.    Yeah, I'm listening.                          03:15:22PM
```

| | |
|---|---|
| 1 | A.   He subsequently passed away.  It was a very |
| 2 | confusing period. |
| 3 | **Q.   All right.** |
| 4 | A.   Disorienting period. |
| 5 | **Q.   But you did learn?** |
| 6 | A.   Soulful period. |
| 7 | **Q.   Even by your testimony you learned shortly** |
| 8 | **after his death that he had changed his trust** |
| 9 | **agreement?** |
| 10 | A.   Shocking to me. |
| 11 | **Q.   All right.  Even though the both of you used** |
| 12 | **the same lawyers in 2018?** |
| 13 | A.   That's right. |
| 14 | **Q.   So the lawyers never mentioned it to you?** |
| 15 | A.   No. |
| 16 | **Q.   And your brother never mentioned it to you?** |
| 17 | A.   No. |
| 18 | **Q.   Did you read the trust agreement in which he** |
| 19 | **disinherited you from the Aquamarina property?** |
| 20 | A.   No. |
| 21 | **Q.   Well, how did you know that he did that?** |
| 22 | A.   I did after he passed away and I read it. |
| 23 | **Q.   So you read the trust?** |
| 24 | A.   After he passed away. |
| 25 | **Q.   Okay.  And did you remember -- did you read** |

Timestamps:
03:15:31PM
03:15:39PM
03:15:48PM
03:16:01PM
03:16:11PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1    the entire agreement?

2        A.   I'm sure I did.

3        Q.   **And do you remember what the agreement said?**

4        A.   Oh, yeah.  Word for -- word by word.

5        Q.   **In general?**                              03:16:21PM

6        A.   How can I remember that that far back?

7        Q.   **Well, we're talking about 2019.**

8        A.   That's all, huh?

9        Q.   **You read the trust agreement?**

10       A.   That's over four years.                      03:16:33PM

11       Q.   **But read the agreement -- you read the**

12   **trust?**

13       A.   I assume I did.

14       Q.   **All right.  And in it, do you recall who he**

15   **deeded the property to?**                           03:16:43PM

16       A.   Me.

17       Q.   **I'm talking about in 2018 when he changed**

18   **the trust agreement.  Who did he -- in place of**

19   **you -- deed or request that the property be**

20   **transferred to somebody else and not you?**         03:16:59PM

21       A.   I'm not clear on that.

22       Q.   **Well, who's Brandon Lannan L-A-N-N-A-N?**

23       A.   He was an old friend.

24       Q.   **And when you read the trust agreement,**

25   **didn't you read that, in fact, at the behest of your**  03:17:13PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1   brother, the residence at 2416 Calle Aquamarina,

2   San Clemente, California -- a friend of your

3   brother's -- that if he survived your brother by

4   30 days, he was to receive the property on

5   Aquamarina -- Calle Aquamarina -- free of the trust?          03:17:29PM

6       A.   No.  I don't recall that.

7       Q.   You don't recall that?

8       A.   I don't recall that.

9       Q.   I'm going to show you that exhibit, which

10  has been marked Exhibit 5, and ask you to read right          03:17:40PM

11  there.

12           (Defendant's Exhibit 5 was marked

13           for identification by the court

14           reporter and is attached hereto.)

15           THE WITNESS:  It says what you said.                  03:18:00PM

16  BY MR. SHERMAN:

17      Q.   Is this the first time that you're aware

18  that that's what the trust agreement said?

19      A.   Yeah.

20      Q.   Right this moment?                                   03:18:08PM

21      A.   Yeah.

22      Q.   That's page 4 of that trust agreement --

23  trust paper?

24      A.   Yes.  There are other names on here, too.

25      Q.   I understand, and we're going to get to that          03:18:26PM

1  in a moment, but your testimony is, as we sit here

2  today September the 17, 2023, at 2:15 P.M., this is

3  the first time you realize that your brother had

4  disinherited you from receiving Aquamarina property?

5      A.   Don't use that word, "disinherit."  He would    03:18:47PM

6  never disinherit me.  Never.

7      Q.   All right.

8      A.   What a horrible word.

9      Q.   What word would you --

10     A.   Disinherit is to throw a person down the         03:18:56PM

11 drain.  Discount them.  My brother would never do to

12 that.

13     Q.   What did your brother do in that agreement?

14 In that trust paper?

15     A.   This is all news to me.  I don't recall.          03:19:09PM

16     Q.   So in 2019, after you -- you had a copy of

17 this trust agreement in 2019?

18     A.   No, I did not.

19     Q.   You just testified a moment ago -- don't

20 interrupt, please -- you testified just a moment ago    03:19:24PM

21 that you discovered this trust agreement within a few

22 weeks of your brother's death?

23     A.   Within a few weeks.  Maybe it didn't fall on

24 this document that you're holding.  It doesn't fall

25 on that date.                                            03:19:42PM

1    Q.   Well, didn't you make a claim today and in

2    other times, that you believed that somehow

3    Brandon --

4    A.   I'm confused with the dates.  I'll be honest

5    with you.  I'm totally confused with the dates.                03:19:54PM

6    Q.   Forget about the dates.  Didn't you --

7    A.   What do you mean, "Forget about the dates?"

8    Either he's alive or he's dead.  Either he told me or

9    he didn't.  Either he wrote about it or he didn't.

10   And I don't recall any of that.  Do you understand              03:20:06PM

11   me?  I do not recall any of that changing of the will

12   back to some other entity there.

13   Q.   Haven't you previously testified, and in a

14   statement also given to the prosecution, that you

15   believe --                                                      03:20:23PM

16   A.   Well, you tell me I have.  You're putting

17   words in my mouth.  I don't know.

18   Q.   Let me ask my question.  May I please.

19   Didn't you testify at different times and

20   also make a statement to the Government that you                03:20:38PM

21   believe that somehow Brandon Lannan use some type of

22   coercion to get your brother to change the trust?

23   A.   I'm not knowledgeable of that.

24   Q.   You have no knowledge of that?

25   A.   No knowledge.                                              03:20:55PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1    Q.   And you have no knowledge ever making that

2    statement?

3    A.   I have no knowledge ever making that

4    statement.

5    Q.   And you have no knowledge of making that        03:21:00PM

6    statement within the last two weeks of your other

7    deposition?

8    A.   I have no knowledge of making that

9    statement.

10   Q.   Didn't you --                                    03:21:06PM

11   A.   For the last two weeks of my deposition.

12   Q.   Didn't you make the statement within the

13   last half hour that the trust of your brother, the

14   amendment in 2019, was some kind of a document?

15         MS. RABBANI:  Objection.  Misstates his         03:21:21PM

16   testimony

17         THE WITNESS:  That's incorrect.

18   BY MR. SHERMAN:

19   Q.   Well, what did you say?

20   A.   He would never make a phony document, and he     03:21:24PM

21   would never mislead.  He would never take me off the

22   will at all in any way.

23   Q.   So you believe that this document is phoney?

24   A.   I don't know.  I wish I could call him back

25   and ask him.  "These are yours?"                      03:21:40PM

1          What's the signature on that?  Let me see
2     it.
3          Q.   All right.  I'm going to approach the
4     witness and show you page 23 and show you your
5     brother's signature which was notarized by a notary.      03:21:52PM
6          A.   That could be his signature.
7          Q.   You see it's notarized?
8          A.   Yeah, it's notarized.  I don't know.  This
9     is confusing.  Very confusing.
10         Q.   Well, I understand that you consider this          03:22:22PM
11    confusing, but do you have any doubt that your
12    brother in 2019 --
13         A.   I have lots of doubts from what you're
14    saying here.
15         Q.   All right.  Let me finish the question.           03:22:33PM
16         A.   Yeah.  Go ahead.
17         Q.   Do you have any doubt that your brother
18    decided not to deed the Aquamarina property to you
19    but in fact decided to deed it to Mr. Lannan instead?
20         A.   I'm unaware of that.                              03:22:49PM
21         Q.   Well, you just read the document?
22         A.   I don't care what the document says.  It's
23    either in my opinion or not.
24         Q.   And your opinion is that your brother didn't
25    do that?                                                   03:23:00PM

1    A.   That's my opinion.

2    **Q.   Even though your brother's signature is**

3  **notarized?**

4    A.   Why he would do that when all of our lives

5  we promised everything to each other.  That's what we      03:23:11PM

6  promised, truly everything, with exception to the

7  piano I told you about and a couple of other minor

8  things.  Oh, the records to my cousin.  My

9  mother's -- not record but -- paintings.  My mother's

10  paintings, and several other nice paintings that he      03:23:31PM

11  had to my cousin Drew.  And I'm trying to think of

12  another.  There was another one that I recall it was.

13  It wasn't any of those people.

14    **Q.   Okay.  So when you read the document some**

15  **time after your brother's death, what document did**      03:23:53PM

16  **you read?**

17    A.   Oh you're going -- you're going to hold me

18  to that?

19    **Q.   I'm sorry?**

20    A.   You're going to hold me to that?      03:23:59PM

21    **Q.   Well, that's what you said?**

22    A.   From 2019 now?

23    **Q.   Yes.**

24    A.   Four years?  I can't recall.

25    **Q.   What can't you recall?**      03:24:08PM

```
1        A.    The validity of what you're saying.
2        Q.    Well, you're the one that said that you read
3    your brother's amendment to the 2018 trust some time
4    within a few weeks of your brother's death.  You're
5    the one that said that.                                    03:24:23PM
6             MS. RABBANI:  Objection.
7             Go ahead.
8    BY MR. SHERMAN:
9        Q.    Did you read the document or not?
10       A.    I believe I did.                                 03:24:30PM
11       Q.    And do you remember what it said?
12       A.    Very honestly?  No.  I don't recall.
13       Q.    So it's difficult for you to remember what
14   was going on in the year 2019?
15             MS. RABBANI:  Objection.                         03:24:47PM
16             THE WITNESS:  '18.
17   BY MR. SHERMAN:
18       Q.    No.  2019.  After your brother's death.  Was
19   that a confusing period for you?
20       A.    Yeah.  I'm in the hospital.  I have a stent      03:24:55PM
21   put in my heart.  And he's passing away.  He's not
22   coming through the fourth surgery on his heart.  Do
23   you think I'm concentrating on goddamn document?  How
24   dare you.  How dare you.
25       Q.    And I take it --                                 03:25:13PM
```

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1     A.   You don't concentrate on crap like that.

2     **Q.   So the trust agreement that your brother**

3  **changed in 2018 (sic) in which he took you off as the**

4  **beneficiary of the Aquamarina property, it was too**

5  **confusing in 2019 for you to comprehend that?  Is**          03:25:29PM

6  **that your testimony?**

7     A.   I'm assuming that you're giving me correct

8  dates.  We don't know.  There's only one person that

9  knows.  That's him.

10     **Q.   How about the lawyers that prepared this**          03:25:41PM

11  **document?  They would know.**

12     A.   Oh, they're going to show me the documents

13  as soon as he died.  That doesn't happen that way.

14          THE WITNESS:  Am I correct, attorneys?

15  BY MR. SHERMAN:                                                03:25:50PM

16     **Q.   You can't ask them questions?**

17     A.   No.  They don't give you data about your

18  brother's dying.  "This is what's going to happen."

19  "You better get prepared for it."  Sometimes that

20  happens.  Sometimes it doesn't.  In this case, it             03:26:01PM

21  didn't.

22     **Q.   What didn't happen?**

23     A.   This knowledge that you're trying to give me

24  here.

25     **Q.   So in other words, you can't remember**             03:26:11PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1    whether your brother, in fact, did this or didn't?

2    In other words, removed you from obtaining the

3    Aquamarina property?

4        A.   I'm quite as sure he did not.

5        Q.   Just as you're as confident that you never                03:26:24PM

6    signed documents with Mr. Dawood to sell the

7    Aquamarina property; is that correct?

8        A.   Who's "Dah-wood"?

9        Q.   "Day-wood."  However you want to call it.

10       A.   Oh, "Day-wood."  Okay.  You mispronounced              03:26:37PM

11   his name.  I don't know.

12       Q.   And you also are confused about the Hawaii

13   property, aren't you?

14       A.   Yeah.  Specifically on every date that you

15   recommend it.                                                   03:26:55PM

16       Q.   Forget about the dates.  I'm not talking

17   about the dates.  As far as signing documentation

18   that you, in fact, sold the Hawaii property, employed

19   a lawyer to do it, and signed a purchase agreement,

20   and, in fact, received the proceeds from the sale, is          03:27:07PM

21   that all confusing to you now?

22       A.   Yeah.  I didn't receive any proceeds.

23       Q.   Even though we have documentation showing

24   that the money was wired to your account?

25       A.   I think it was wired to Mr. Dawood's                   03:27:23PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

| | |
|---|---|
| 1 | accounts. I assume it was wired to Mr. Dawood's |
| 2 | accounts because I was not in receipt of it. |
| 3 | Q. Before I get more -- excuse me. |
| 4 | Do you recall an interview you had with |
| 5 | FBI Agent Julie Sawyer in October 30th of 2020? |
| 6 | A. I don't know if that date is correct, but I |
| 7 | did meet with her. |
| 8 | Q. And do you remember telling Ms. Sawyer in |
| 9 | 2020 that, quote: |
| 10 | "I discovered that after Jack passed, that |
| 11 | he apparently talked my brother to change his will |
| 12 | and trust -- I never was informed of this -- to take |
| 13 | Jack's house away. No way. Jack and I always have |
| 14 | promised everything we had owned to be given to each |
| 15 | other when God called us home. I was not informed of |
| 16 | his will and trust over ever. I believe no one was |
| 17 | aware of this." |
| 18 | Do you remember telling her that? |
| 19 | A. Not in total. |
| 20 | Q. Well, would you like to see the report? |
| 21 | MR. SHERMAN: May we have this marked as |
| 22 | next in order. |
| 23 | (Defendant's Exhibit 7 was marked |
| 24 | for identification by the court |
| 25 | reporter and is attached hereto.) |

03:28:05PM

03:28:20PM

03:28:37PM

03:28:50PM

03:28:58PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1           THE WITNESS:  You can fool a person with

2     dates very easily.  Dates are not always the facts.

3     You know?  You're trying to squeeze facts from me

4     that I cannot recall.  No one can recall years and

5     years ago.  Many people can't tell you what they had          03:29:23PM

6     for breakfast.  Isn't that true?  You know, you're

7     holding me to dates and signatures --

8     BY MR. SHERMAN:

9         Q.   This --

10        A.   -- changes.  Monumental changes?                     03:29:35PM

11        Q.   **This statement says that you told**

12    **Julie Sawyer in 2020 -- October of 2020 -- that you**

13    **discovered, that after Jack passed away, that this**

14    **Mr. Lannan apparently talked Jack, your brother, to**

15    **change his will and trust, giving him the house?**          03:29:59PM

16        A.   Oh, no.

17        Q.   **You never told Julie Sawyer --**

18        A.   Oh, no.  Never.  That's a total misquote.

19        Q.   **So Julie Sawyer, in making your report that**

20    **says that -- you never -- you never told her that?**        03:30:09PM

21        A.   I don't believe so at all.

22        Q.   **Do you remember writing her an e-mail in**

23    **which you said this?**

24        A.   No.

25        Q.   **Okay.  May I show you a document.**                03:30:23PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1             (Mr. Sherman hands the witness a document.)

2    BY MR. SHERMAN:

3         Q.   Is that your e-mail?

4         A.   I was never informed of this.  You take

5    Jack's house away?  Exclamation point, no way.  Jack          03:31:29PM

6    and I always have promised everything we had owned to

7    be given to each other when God called us home.  I

8    was not informed of his will and trust changeover --

9    trust changeover ever.  I believe no one was aware of

10   these.                                                         03:31:55PM

11        Q.   Is that your e-mail address at the top?

12        A.   Yeah.

13             MS. RABBANI:  Victor, you've got about five

14   minutes left.

15   BY MR. SHERMAN:                                                03:32:09PM

16        Q.   Now, do you recall sending this e-mail?

17        A.   No, I don't.

18        Q.   So this is approximately about three years

19   ago?

20        A.   Yeah.                                                03:32:18PM

21        Q.   Okay.  And so you don't recall this e-mail?

22        A.   I don't recall.

23        Q.   And you don't recall telling Agent Sawyer

24   what is included within this e-mail?

25        A.   No.                                                  03:32:29PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1    Q.   And your testimony is that in October of

2    2020, you had no idea that your brother had removed

3    you as the beneficiary of the Aquamarina --

4    A.   That's correct.

5    Q.   -- house; is that correct?                03:32:43PM

6    A.   That's correct.

7    MR. SHERMAN:   Where's the deposition?

8    Where's that page?

9    THE WITNESS:   I wish I could recall these

10   dates, but I simply can't.                       03:33:10PM

11   BY MR. SHERMAN:

12   Q.   Do you know somebody named Brandon Lannan?

13   A.   Yes.

14   Q.   Isn't it a fact that within -- once you

15   found out that your brother had decided to give the  03:33:41PM

16   property to Mr. Landon (sic), that you had a

17   conversation with him about that fact?

18   A.   No.

19   Q.   Did you ever talk to Mr. Landon (sic) within

20   a week to ten days after your brother died?          03:33:54PM

21   A.   No.

22   Q.   Do you recall testifying on October the 5th,

23   2013 (sic), which is approximately two weeks ago,

24   that you did talk to Mr. Lannan within ten days after

25   you discovered that your brother had deeded or given  03:34:13PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1  the property to Mr. Lannan?  That you had a

2  conversation with him about it?

3      A.   No.

4      Q.   Do you remember even mentioning

5  Brandon Lannan's name at the deposition that you gave      03:34:24PM

6  on October the 5th?

7      A.   No, I do not.

8      Q.   That's only twelve days ago.  You have no

9  recollection of that?

10     A.   No.                                              03:34:34PM

11     Q.   You were aware, were you not, that in your

12 brother's trust he decided to give a distribution of

13 his estate to various other individuals other than

14 Mr. Lannan and yourself?

15     A.   I told you about the piano.  I told you       03:34:58PM

16 about the paintings.  I told you about some other

17 little miscellaneous stuff --

18     Q.   How about the fact --

19     A.   -- that my other cousin --

20     Q.   How about the fact that he decided in his     03:35:11PM

21 trust to give 10 percent of the trust estate to his

22 friend Allen Koziol K-O-Z-I-O-L?

23     A.   I never knew that.

24     Q.   Did you know that he decided to give

25 5 percent of his trust to his friend Kyle Atherton?     03:35:26PM

1      A.    No.

2      Q.    Did you know that in his trust he wanted to

3  give 5 percent to his cousin Drew Battaglia?

4      A.    I knew that he wanted to give Drew the

5  paintings.                                              03:35:39PM

6      Q.    How about 5 percent of the trust?

7      A.    No.  It was just the paintings of my

8  mother's and other people.

9      Q.    So you never knew --

10      A.    Drew liked these.                            03:35:48PM

11      Q.    All right.  To make this simple, he also

12  decided to give 5 percent of the trust after

13  distribution to you -- your percentage -- 5 percent

14  to Nick Stratis, 5 percent to Bob Ryan, 2 percent to

15  Tina Lee, 2 percent to Dustin Weden W-E-D-E-N,        03:36:07PM

16  2 percent to Vivien Nelson, 2 percent to

17  Vince Crowder and Liz Crowder C-R-O-W-D-E-R, and

18  2 percent to Matt Dimeo.  Did you know any of that?

19      A.    No, I did not.

20          MS. RABBANI:  Also times up.  I'll give you   03:36:27PM

21  a couple minutes to wrap up, but that is 90.

22  BY MR. SHERMAN:

23      Q.    Well, as the trustee, didn't you have an

24  obligation --

25      A.    But you don't read those things every five  03:36:37PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1   days.  Nobody does.

2   **Q.   As the trustee, you had the obligation to**

3   **look at your brother's trust to see what he wanted to**

4   **be done upon his death?**

5   A.   Yeah.                             03:36:49PM

6   **Q.   Didn't you take that seriously?**

7   A.   Sure.

8   **Q.   Well, what did you do to decide --**

9   A.   Well, you're talking about weeks.  How many

10  weeks are you talking about?  That I knew this and I    03:36:56PM

11  knew that and I knew the other thing.

12  **Q.   At some point didn't you want to look at**

13  **your brother's trust document to see what he wanted**

14  **to be done upon his death?**

15  A.   Not that specific.                 03:37:15PM

16  **Q.   Well, didn't you want to go to --**

17  A.   Because I assumed all my life that

18  everything was coming here.

19  **Q.   But you knew that your brother in 2018 had**

20  **gone to the lawyers to amend the trust at the same**    03:37:25PM

21  **time that you did?**

22  A.   No.  That was verbal.  That was verbal.  It

23  wasn't written.

24  **Q.   Well, you just you said earlier that you and**

25  **your brother went to the same lawyers to have new**    03:37:36PM

1   trust documents prepared?

2       A.   But there was no mention of any major

3   changes.

4       Q.   **Well, didn't you want to go to those trust**

5   **attorneys to see what your brother had done?**                     03:37:51PM

6       A.   No.  Why would I second guess him?  He never

7   told me a lie ever.

8       Q.   **Why did you think he went in 2018 to modify**

9   **his trust agreement -- trust document?**

10      A.   I don't think that.  You think that.  You're   03:38:05PM

11  trying to put words in my mouth.

12      Q.   **You know that he went to the lawyers to**

13  **change his trust.  You testified to that.**

14      A.   Not specifically.

15      Q.   **What do you mean, "not specifically"?**                    03:38:18PM

16      A.   Well, I don't know what he did.  If I knew,

17  I could tell you.

18      Q.   **Okay --**

19      A.   If he were here, he'd tell you.

20      Q.   **-- and not knowing what he did, you had a**         03:38:28PM

21  **fiduciary obligation to go to the lawyers and say,**

22  **"Hey, did my mother -- brother change the trust?  Let**

23  **me see the trust documents.**

24      A.   No.  I wouldn't do that.

25      Q.   **Why not?**                                                  03:38:39PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1    A.   Because I wouldn't have any idea that he
2  changed anything.
3    **Q.   You testified earlier that you knew in 2018**
4  **he did, in fact, go and change his trust?**
5    A.   Well, that was misnomer then.  I didn't          03:38:48PM
6  understand you correctly.
7    **Q.   All right.**
8         MR. SHERMAN:  We can stop at this point.  I
9  have lots more questions.  I haven't even -- I'm not
10 even half done.                                           03:38:59PM
11        MS. RABBANI:  I understand.
12 BY MR. SHERMAN:
13   **Q.   By the way, just for your information, I**
14 **have text messages between you, Mr. Dawood, in which**
15 **you acknowledge that the proceeds from the Hawaii**      03:39:10PM
16 **property were, in fact, to be sent to the B of A**
17 **account.**
18   A.   Well, let me see them.
19   **Q.   I'm happy to do that.**
20        MR. SHERMAN:  Are we still on the record?          03:39:24PM
21        May we have this exhibit --
22        MS. RABBANI:  Do you have a copy of that for
23 us?
24        MS. REGNIER:  I do.
25 ///

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

```
 1              (Defendant's Exhibit 8 was marked
 2              for identification by the court
 3              reporter and is attached hereto.)
 4   BY MR. SHERMAN:
 5        Q.   There's an e-mail from you to Jim from          03:39:45PM
 6   Bobby.  Who's Bobby?
 7        A.   I don't know.
 8        Q.   What is your e-mail address?
 9        A.   Currently?
10        Q.   Well, was it TMBGRP@aol.com?  Would you         03:40:00PM
11   please look at this e-mail.
12        A.   Yeah.  The name is wrong.  It's my initials.
13             Who's Jim Bobby?  Who are Jim and Bobby?
14        Q.   Who do you think they are?
15        A.   No.  I don't know.                              03:40:53PM
16        Q.   You don't know who Jimmy is?
17        A.   Oh.  Jim Dawood.
18        Q.   Doesn't this refresh your memory that, in
19   fact, you knew that the money was going to be sent to
20   the B of A account regarding the sale of the Hawaii       03:41:05PM
21   property?  Isn't that what this e-mail is about?
22        A.   I don't know what it's about.
23        Q.   Well, you wrote it.
24        A.   Yeah.  I wrote it, and you're talking
25   about -- you're talking about October the 15th.          03:41:22PM
```

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1    Q.   Right after the sale of the Hawaii property.

2    And you wrote Jim and said and told him --

3    A.   Two days after my brother passed away.

4    Q.   It's not two days after your brother passed

5    away.                                                    03:41:41PM

6    A.   Yeah.  Wait a minute.  It's Tuesday, October

7    the 15th.

8    Q.   Your brother died July 13th.

9    A.   About a month.

10   Q.   You were -- you sent an e-mail to Jim saying    03:41:52PM

11   that the guy from Title Guaranty called you to

12   confirm the B of A wire instructions to send the

13   money from the sale of the Hawaii condo.  That's what

14   that e-mail says.

15        MS. RABBANI:  Is there a question?  I           03:42:12PM

16   think --

17   BY MR. SHERMAN:

18   Q.   Isn't that what the e-mail says?

19   A.   It's kind of blurred.  It doesn't read like

20   you stated.                                            03:42:24PM

21   Q.   In other words, all of these events are very

22   blurry to you.  Is that your testimony?

23   A.   No.  I'm not saying that.

24   Q.   What are you saying?

25   A.   I'm saying that some of the assumptions that    03:42:33PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1  you're making are incorrect.  That's what I'm saying.

2      Q.   Okay.

3      A.   How can I prove this date, that date, the

4  other date, a week from now?  How can I do that?  Can

5  you do that?  If you can, you're a Houdini.  You're          03:42:47PM

6  great.  Congratulations.  I can't do that.

7      Q.   You're having trouble remembering what

8  happened in 2018 and 2019, aren't you?

9      A.   Well, when you're in the hospital having a

10  surgery in your heart, you know, wouldn't you?            03:43:08PM

11      Q.   You're having trouble remembering what

12  happened in 2018 and 2019 for whatever reason?

13      A.   That's a generalized statement.  I'm not

14  making that as a blanket statement.

15      Q.   But as far as what document you signed and    03:43:23PM

16  business relationships you had, it's all kind of

17  blurry, isn't it?

18      A.   Well, they can give you drugs and different

19  things when you're in the hospital.  You don't know

20  what you're doing; isn't that right?                      03:43:34PM

21      Q.   Thank you very much.

22      A.   You're welcome.

23          MS. RABBANI:  Let's go off the record.

24          THE VIDEOGRAPHER:  We're off the record the

25  time is 3:43 P.M., Pacific Time.                          03:43:47PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1              (Whereupon a recess was taken.)

2              THE VIDEOGRAPHER:  We're back on the record.

3    The time is 3:51 P.M., Pacific Time.

4                    FURTHER EXAMINATION

5    BY MS. RABBANI:                                    01:54:12PM

6         Q.   Mr. Battaglia, do you have some trouble

7    remembering specific dates on which you might have

8    read specific documents a few years back?

9         A.   I think everyone does.

10        Q.   Do you have a clear recollection of your     03:51:38PM

11   relationship with Jimmy Dawood?

12        A.   I believe I do.

13        Q.   And are you certain, sitting here today,

14   that you never asked him or authorized him to invest

15   that trust money in any other project?              03:51:55PM

16        A.   Yes.  I am sure of that.

17        Q.   You testified earlier that on at least one

18   occasion, Mr. Dawood had you sign some documents.  Do

19   you remember that?

20        A.   Yes.                                       03:52:10PM

21        Q.   Were there occasions when he had you sign

22   documents and you didn't read them?

23        A.   Yes, there were.

24        Q.   Is it possible that he had you sign

25   documents relating to the sale of the Hawaii          03:52:23PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1  properties?

2  A.  It's possible.

3  Q.  Do you remember whether he ever had a notary

4  there when you signed documents?

5  A.  Well, he took me to several of them that he          03:52:36PM

6  seemed to know personally.

7  Q.  So that happened -- did that happen more

8  than once?

9  A.  Yes.

10  Q.  Do you remember whether he ever had you sign          03:52:48PM

11  something like electronically, on an iPad or a

12  computer?

13  A.  No.

14  Q.  Okay.  Did you understand that ownership of

15  the Hawaii properties was at some point transferred          03:53:03PM

16  away from you?

17  A.  Well, that's confusing.  Because he said he

18  was going to do -- put it into an entity for a period

19  of time to, quote, unquote, to protect me, and that

20  it would be released at a period of time again to          03:53:25PM

21  protect me.  That was my understanding.

22  Q.  So did you understand that ownership of the

23  Hawaii properties would come back to you after some

24  time?

25  A.  Absolutely yes.          03:53:39PM

1    Q.    Did you ever want to part with the Hawaii
2   properties permanently?
3    A.    Well, the thought crossed my mind, you know,
4   but when you're dealing with the dynamics that I was
5   dealing with, it was pretty pretty difficult to make      03:53:57PM
6   ironclad statements that you totally would called.
7    Q.    Did you ever agree to sell either Hawaii
8   property permanently?  In other words, to permanently
9   part with your interest in it?
10   A.    We talked about that.                                03:54:18PM
11   Q.    Did you ever agree to do it?
12   A.    I don't recall.
13   Q.    Would you ever have agreed to sell your
14   interest in either condominium suite permanently --
15   A.    No.                                                  03:54:33PM
16   Q.    -- for 200 -- not at all?
17   A.    No.  Never.
18   Q.    If you were going to sell it, would you have
19   agreed to sell it for $200,000?
20   A.    Absolutely not.  Not when the first one,            03:54:41PM
21   906, was worth over well over a million.  And the
22   other one, well over $500,000.  Well over these
23   amounts.
24   Q.    And what was your understanding of those
25   values based on?  Was it based on --                      03:54:59PM

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

```
1       A.   Prior sales.
2       Q.   -- prior sales of similar units?
3       A.   Yeah.  In Hawaii.  Yeah.
4       Q.   Do you need a minute with the phone?
5       A.   Yeah.                                           03:55:45PM
6            Can't make it work.
7       Q.   Do you need help?
8       A.   Yeah.  I'm trying to turn it off.
9       Q.   I have like two more questions --
10      A.   Go ahead.                                       03:56:22PM
11      Q.   -- and then we'll be done and take a break
12  and you can have it back.
13           Do you have any knowledge, one way or
14  another, whether your brother Jack ever knew
15  Jimmy Dawood?                                            03:56:35PM
16      A.   I'm positive he did not.
17      Q.   He did not.
18      A.   No.
19      Q.   And as far as you understand, Jimmy Dawood
20  was never intended to be a beneficiary of your           03:56:41PM
21  brother's trust?
22      A.   Absolutely not intended or known to be.
23           MS. RABBANI:  I don't have any more
24  questions.
25           THE WITNESS:  At this time I don't really       03:56:59PM
```

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

1    have any more questions.

2              MS. RABBANI:  Thank you --

3              THE WITNESS:  I may have some, but I don't

4    recall anything urgent that I bring up at this point.

5              MS. RABBANI:  Okay.  And I'm done.                    03:57:14PM

6              THE WITNESS:  I hope that the statements

7    that I have made are as clear as possible, you know,

8    due to my recollection.

9              MS. RABBANI:  We appreciate you sitting

10   here.  I know this is not the easiest day to do it.          03:57:25PM

11             THE WITNESS:  It's okay.

12             MS. RABBANI:  But I'm done, so can we go

13   ahead and go off the record.

14             THE VIDEOGRAPHER:  Here concludes Volume I

15   in video deposition of Thomas Michael Battaglia, and        03:57:37PM

16   we're off the record at 3:57 P.M., Pacific Time.

17             (Whereupon the deposition was

18             adjourned at 3:57 P.M.)

19

20

21

22

23

24

25

COURT REPORTERS/VIDEOGRAPHERS/INTERPRETERS

```
 1          CERTIFIED SHORTHAND REPORTER'S CERTIFICATE

 2

 3          I, ANDREW T. HA, CSR #14537, hereby certify

 4   that I am a Certified Shorthand Reporter in and for

 5   the State of California.

 6          I hereby certify that the witness in the

 7   foregoing deposition, THOMAS BATTAGLIA, was by me

 8   duly sworn to testify the truth, the whole truth and

 9   nothing but the truth; that said deposition was taken

10   at the time and place therein set forth; and was

11   taken down by me in stenotype and transcribed into

12   typewriting by computer; and that the deposition is a

13   true record of the testimony given by the witness.

14          That before completion of the deposition,

15   review of the transcript [ ] was [x] was not

16   requested. If requested any changes made by the

17   deponent (and provided to the reporter) during the

18   period allowed are appended hereto.

19          I further certify that I am neither counsel

20   for, nor related in any way to any party to said

21   action, nor otherwise interested in the result of

22   outcome thereof.

23

24                                    Andrew T. Ha

25   Date:  10/27/2023      ANDREW T. HA, CSR NO. 14537
                            STATE OF CALIFORNIA
```

Exhibit B
[to be lodged]